STATE OF NEBRASKA, APPELLEE, V. GARWOOD L. DONNELSON, APPELLANT.

402 N.W.2d 302

Filed March 20, 1987.   No. 86-492.

Robert B. Creager of Berry, Anderson, Creager & Wittstruck, for appellant.

Robert M. Spire, Attorney General, and Lynne R. Fritz, for appellee.

KRIVOSHA, C.J., BOSLAUGH, WHITE, HASTINGS, CAPORALE, SHANAHAN, and GRANT, JJ.

GRANT, J.

The defendant, Garwood L. Donnelson, appeals his conviction by a jury of manslaughter in violation of Neb. Rev. Stat. § 28-305 (Reissue 1985). The defendant alleges the district court erred in failing to grant a continuance to allow defendant to properly prepare for the State's expert testimony; in failing to grant defendant's motion for dismissal of the charge against him because of insufficiency of the evidence; in failing to grant a new trial based on a posttrial affidavit concerning testimony of two of the State's expert witnesses; and in failing to sentence the defendant to probation, rather than imprisonment. We affirm.

The record discloses the following. In an information filed September 4, 1985, the defendant, Garwood Donnelson, was charged with manslaughter in the death of Carolyn Witthoff. The defendant had been present when the deceased suffered an injury which led to her death due to a subdural hematoma.

After a trial to a jury, the defendant was found guilty of killing Carolyn Witthoff without malice, either upon a sudden quarrel or unintentionally while in the commission of an unlawful act. The defendant was sentenced to imprisonment in the Department of Correctional Services for a term of 3 years.

The evidence before the jury was largely circumstantial. No one else was present at the time of the death other than the defendant. He alleges Mrs. Witthoff apparently fell while extremely intoxicated and suffered the injury from which she died.

Evidence adduced before the jury showed the following. In approximately 1971 the defendant became acquainted with the deceased's husband though their involvement in various political activities. The defendant and his wife became friends with Mr. and Mrs. Witthoff. The couples took vacation trips together. In approximately 1976, the relationship between the defendant and Mrs. Witthoff changed. Their meetings were infrequent at first, meeting at bars and sometimes at conventions. In 1980, while the couples were on a trip to Europe, the defendant's wife became aware of a new closeness in the relationship between defendant and Mrs. Witthoff. An unpleasant scene followed, and the defendant's wife discontinued her friendship with Mrs. Witthoff. Mrs. Witthoff and the defendant continued seeing one another. Their meetings became more frequent, and in 1980 defendant and Mrs. Witthoff rented a small apartment in Lincoln, Nebraska. Each of them continued to reside in their respective marital houses. The apartment rent was divided between the two. A pattern developed. For about 2 years before August 31, 1985, the defendant and Mrs. Witthoff met at the apartment for lunch two or three times a week. They would also meet in the evenings after work two or three times a week, and they would spend nearly every Saturday together at the apartment. A typical Saturday meeting would include meeting for lunch and drinks. The couple would spend the balance of the afternoon at the apartment drinking, sleeping, and engaging in sexual relations. This relationship continued until August 31, 1985, a Saturday.

On that day, the defendant and Mrs. Witthoff met at the apartment about noon. They consumed alcoholic drinks,

talked, and had lunch around 1 or 1:30 p.m. Over the next 4 hours the couple slept and engaged in sexual relations. At approximately 5 p.m. the defendant decided to leave. He got dressed and left the apartment to call a cab to go to his home. He testified he walked for about a block, then turned around and walked back to the apartment. A resident of the apartment house testified that at approximately 5:45 p.m., as the witness was leaving his apartment located directly across the hall from the deceased's apartment, he saw Mrs. Witthoff, standing in the doorway, unclothed. Upon seeing the witness, Mrs. Witthoff closed her door immediately. The witness observed no injuries on her body at that time. As the witness left the building he observed the defendant walking away from the building, and then turning back toward the building. The witness paid his rent to the landlady in the next apartment building and returned to his apartment for about 15 minutes. The witness then left to buy groceries and returned in about 45 minutes, stayed about 15 minutes, and left again at approximately 7 p.m. Upon his return to his apartment at approximately 8:30 p.m., he saw a police car in front of the apartment. During his presence in his apartment during his various returns, the witness heard no unusual noises in Mrs. Witthoff's apartment.

Defendant testified that he returned to the apartment because he thought Mrs. Witthoff may have begun getting dressed and she could drive him home. She had not begun getting dressed, and the defendant removed his clothing and the two resumed drinking.

The defendant testified that as Mrs. Witthoff was walking through the apartment she bounced off a table, knocking a lamp onto the floor and breaking it. The two of them then attempted to pick up the broken glass, at which time, the defendant testified, he cut his thumb. A piece of glass with blood on it was recovered from the trash can.

The defendant testified that he then passed out again, and that upon awaking at approximately 8:30 p.m., he saw Mrs. Witthoff lying on her back on the floor. The defendant testified he could not really see Mrs. Witthoff clearly because he did not have his glasses on. When he knelt over her he noticed a black substance around her mouth. He felt that it was blood. He

testified he next jumped up, put his clothes on, and ran upstairs to get someone to phone 911.

A witness for the State, John Phillips, testified that at approximately 8:15 p.m. on the evening in question he was entering the apartment building when he heard a loud conversation taking place in the lower level of the building. He testified that this was unusual because he normally could not hear voices as he entered the building.

At approximately 8:30 p.m., the defendant knocked at the door of Blanche Cejka, the occupant of the apartment just above the apartment rented by defendant and Mrs. Witthoff. Defendant stated that a woman was dying downstairs and requested that Cejka call 911. Cejka could not recognize the man at her door at first, but when he returned a few minutes later and again asked her to call 911, she recognized the man as the defendant. She testified that the second time defendant talked to her, she asked defendant what the problem was and the defendant said a "tantrum," or something to that effect.

Officer Joseph Lefler of the Lincoln Police Department was called to the scene. He was directed to the apartment. The officer met defendant at the door to the apartment house and defendant accompanied him to the apartment, where defendant unlocked the door. The officer talked to defendant, and testified the defendant appeared intoxicated but not "falling down drunk." As Officer Lefler entered the apartment he saw Mrs. Witthoff lying on the floor, unclothed, with blood around her chin and neck. She appeared to be unconscious and was having trouble breathing. The officer testified that as he was examining Mrs. Witthoff, the defendant was sitting on the couch smoking a cigarette, and appeared "nonchalant" about what was happening. When asked by Officer Lefler what had happened to her, the defendant replied she had cut her chin on a light bulb of a lamp.

Two additional officers arrived on the scene and removed the defendant to make room for the medical personnel. The defendant was escorted to a police cruiser. When asked who the victim was, the defendant replied she was his mistress, and that a lamp got broken and he did not remember what happened. The defendant was then taken to the police station.

Medical personnel who arrived at the scene found Mrs. Witthoff unconscious and not responsive to stimuli. They observed a soft area on the back of her head and a deep laceration on her chin. A member of the Mobile Heart Team testified that he noticed the wound on the chin when he felt an irregularity of the skin and a wetness there. He said he pushed on the wound but did not remember entering the wound itself when applying gauze to it. The medical personnel placed a respiratory aid device on the victim and transported her to the hospital.

The defendant was taken to the police station, where he talked to a detective after waiving his *Miranda* rights. The defendant told the detective that both he and the victim were married to others, and "this was our pad." The defendant said to the detective that his "life was ruined." The defendant also told the detective, "[T]his is going to destroy me and her, too. . . . I didn't try to kill the woman for crying out loud. I was surprised." Defendant also stated to the detective, "I'm ruined. If she dies, I'm going to be charged." Defendant admitted that he and the victim had been drinking all afternoon and that "she wouldn't let me leave." Defendant also told the detective that "they had had an argument but that it wasn't violent." The detective asked defendant what happened, and defendant told him that he and Mrs. Witthoff were in the apartment, "but I don't know how it happened." Defendant then told the detective, "I have blood on my hands and on my pants."

After the defendant removed his shirt and pants, the detective observed three red marks on the defendant's shoulder blade, as well as a fresh scratch on the defendant's left thigh and a scratch on his right elbow. The defendant testified he did not know the scratches were there, but felt the scratch on the thigh may have come from sitting on a piece of glass on the couch. No blood was found on the couch. The detective also observed bloodspots on the defendant's pants.

An investigation of the apartment was subsequently conducted by another detective. He saw an area of broken glass on the floor, near a small table. On the table was a gooseneck lamp with a broken bulb and no shade. The broken glass on the floor of the apartment was of two types: white frosted glass

from a light bulb and yellow glass from a glass lampshade. Several pieces of glass were recovered from the garbage can, with one being covered by droplets of blood. This detective also observed a globe sitting on the table, but not properly fitting in its holder. A pair of men's eyeglasses was found on the floor underneath the table. Bloodstains were located throughout various areas of the apartment, including on the oriental rug, on the sink in the bathroom, and on several items of women's clothing. One of the towels in the bathroom was damp throughout, with blood on two areas. The toilet lid was down, and inside the toilet was tissue containing blood.

Mrs. Witthoff was taken to Lincoln General Hospital. The victim was unconscious and unresponsive to painful stimuli. The laceration under her chin was treated. Blood alcohol tests were taken, indicating alcohol in the victim's blood in excess of 0.32 percent. After taking x rays and running other tests, a doctor concluded Mrs. Witthoff's unconscious state was due to a head injury. A neurosurgeon was consulted to determine if surgery would benefit Mrs. Witthoff. Due to the amount of cerebral damage, surgical intervention was deemed inappropriate. Mrs. Witthoff was maintained on life support until the 3d of September, when she was pronounced brain dead and, with the consent of the family, removed from the respirator.

An autopsy of the body was performed by Dr. John Porterfield, a coroner's physician for Lancaster County. Dr. Porterfield is a pathologist, and board certified in clinical and anatomical pathology. He testified the wound under the chin was caused by blunt trauma rather than an incision and that he determined the cause of death was due to "massive bilateral . . . subdural hemorrhage and the complications thereof." He testified that an injury to the head, over the right ear, was, in his opinion, also due to "blunt trauma without pattern." Dr. Porterfield testified that the lamp in the room could have caused the wound on the chin but that he did not have an opinion as to the manner of death. Dr. Porterfield also testified there were two separate traumas, one to the head and one to the chin, and that he could not determine if a wound on the lip was a part of the chin injury. The head injury was the size of a

human hand.

Dr. Porterfield also testified that there was bruising in the scalp, but no bruises on the brain itself. He then described the results of a blow to the right side of Mrs. Witthoff's head, which was called a "coup injury." The doctor then stated, "Injuries to the opposite side of the head sustained by a blow [are] referred to as a contrecoup type injury." Dr. Porterfield then set out the usefulness of the coup-contrecoup concept in determining the manner in which the injury was received. The doctor described the phenomenon as follows:

> But the basic theory behind it all is that if you sustain a blow to the head (gesturing) on the right side, let's say by a 2 by 4 since we're talking about blunt trauma, then if that head is stationary, it's not moving, then the injury to the covering of the brain, whether it be the dura mater or the leptomeninges or the brain itself, and it can be any or all of those, the injury that's sustained by such a blow is going to be on that same side directly underneath the blow whereas in a contrecoup injury, the injury being on the opposite side of the head implies that the brain, that — or rather the head was in motion at the time the injury occurred. For example, the most common example of this would be if somebody falls. If they fall and hit the head on that same 2 by 4, then the main injury is on the opposite side of the head. There could also be injury on the same side of the head but the main injury very frequently in these situations is on the opposite side of the head or a contrecoup injury.

The doctor explained that, in his opinion, the phenomenon occurs because, in a fall, as the falling person's head stops moving the brain inside the skull continues to move and "can frequently produce an injury on the opposite side of the head." The doctor further explained that, in his opinion, if the head is stationary and a moving object strikes the head, the coup-contrecoup result will not be seen. Dr. Porterfield testified that an injury to the left side of Mrs. Witthoff's head was a contrecoup injury. Dr. Porterfield considered that the deceased's head was moving when the injury was sustained. He did not know what put the head in motion, but stated that such

results are often caused by falls.

In addition to the testimony of the coroner's physician, several other expert witnesses testified for the State and for the defendant.

Dr. Mary Case, a physician from St. Louis, Missouri, who was board certified in anatomical pathology, forensic pathology, and neuropathology, Dr. Blaine Roffman, a physician specializing in pathology, and Dr. Joel Kirkpatrick, a neuropathologist, were also called as expert witnesses for the State, with Dr. Kirkpatrick testifying on rebuttal.

In explaining her qualifications, Dr. Case stated that she was one of three physicians in the nation qualified in all three specialties set out above. She testified that neuropathology is the study of the nervous system, including the brain, and forensic pathology is a specialty for the study of sudden and unexpected types of death, to attempt to determine the manner of death. Anatomical pathology had been earlier described as the study of tissues removed from a body.

In addition to her academic background, Dr. Case testified that she had done between 7,000 and 8,000 autopsies during the time from approximately 1975 to trial and that, in addition, she was consulted on and yearly looked at 600 to 800 brains removed in autopsies by other doctors.

Dr. Case then described the records and data she examined in connection with the death of Mrs. Witthoff. She examined a diagram of the scene of the incident and a partial taping of that scene, various sperm reports, the coroner's physician's report, laboratory reports, the autopsy report and the videotape of that report, x rays, the CAT scan, and brain tissues taken from the deceased.

Dr. Case set out her opinion as to Mrs. Witthoff's death as follows:

> The cause of death of this woman is a head injury in which she sustained injury to the right side of the head, it producing very severe internal injury that was a subdural hemorrhage as well as shearing injuries within the brain itself, tearing axons. Now, this is not an injury that you see with the eye but whenever you have any injury to the brain of whatever type, any movement, any commotion to the

brain causes shearing forces and disconnections are made. This was a massive head injury that produced a massive amount of subdural hemorrhage and it caused a very rapid increase in intercranial pressure and so the cause of death is what I refer to as a closed head injury and the nature of which was a massive subdural hemorrhage.

Dr. Case then described, generally, falling head injuries and her concept of the coup-contrecoup phenomenon described by Dr. Porterfield. Dr. Case then testified in great detail as to the physical makeup of the skull and the brain within. Dr. Case disagreed with Dr. Porterfield's conclusion that the injuries to Mrs. Witthoff were the result of a fall. She agreed that "[t]he contrecoup injury is the marker for the fall."

Dr. Case testified that she observed two scalp bruises on the right side of the head and one on the left side, as well as the laceration on the chin. In her opinion the injury to the left side was not a contrecoup injury, and the cause of death was the massive injury to the right side of the head. It was her opinion, to a reasonable degree of medical certainty, that this injury to the right side of the victim's head was caused by a blow and not a fall. It was also her opinion that the laceration on the chin was the result of a blow, rather than a fall.

Dr. Case further testified that she did not know the exact moment the blow to the head was struck, but that the blow was inflicted

sometime like in the evening hours of 8:30, somewhere around there an individual was having difficulty because the ambulance was called because at that time the individual was unconscious. Sometime immediately before that unless they had let that person lay there unconscious for several hours which I can't conceive because this woman would have been dead. That blow was struck shortly before that ambulance was called for her in other words. But I could not give you that precise minute.

Dr. Case also addressed the concept of "lucid interval," which basically means a "loss of consciousness and the regaining of consciousness and then another loss of consciousness." The idea of a lucid interval had been used to explain more than one falling injury. Dr. Case's opinion was

that that approach "makes no sense in this concept," because the lucid interval idea should not be used in terms of a subdural hemorrhage (the cause of death in Mrs. Witthoff's case, as agreed to by all the physicians), but usually in cases of epidural hemorrhage.

Dr. Roffman testified that it was his opinion, to a reasonable degree of medical certainty, that the trauma to the chin was caused by a blunt force. Furthermore, he testified it was highly unusual for a wound such as that to have occurred in a fall, but did not have an opinion as to whether the fatal injury was sustained in a fall or was the result of a blow.

Dr. Kirkpatrick testified it was his opinion the injury to the victim's chin was a result of an object's striking her chin rather than a fall. He further testified that it was his opinion, with a reasonable degree of medical certainty, that the injuries to the head of the victim were sustained from multiple blows to the head, as distinguished from falls.

Testifying for the defendant were Dr. William Eckert, a physician from Wichita, Kansas, specializing in forensic pathology, and Dr. George McClellan, from Omaha, Nebraska, a physician specializing in pathology and neuropathology. Both of these physicians were fully qualified as experts in their fields. Dr. Eckert testified that he observed four possible areas of trauma to the victim's head. In his opinion these wounds were nonassaultive and could best be explained by a series of falls. Dr. McClellan testified he observed three or four areas of trauma to the head. He testified that in his opinion the trauma to the head was not greater than what would be caused by a fall. He testified with a reasonable degree of medical certainty that the injuries could have been caused by a fall or blow, but in his opinion a fall was more probable.

The defendant assigns as error the lower court's failing to grant defendant's motion to dismiss the case against him because of the insufficiency of the evidence to sustain a verdict of guilty. We have held that a trial court will be justified in directing a verdict of not guilty only where there is a total failure of competent proof to support a material allegation in the information, or where the testimony is of so weak or doubtful a character that conviction based thereon could not be sustained.

*State v. Kane*, 224 Neb. 245, 397 N.W.2d 628 (1986); *State v. Bridger*, 223 Neb. 250, 388 N.W.2d 831 (1986). The evidence in this case is largely circumstantial. Circumstantial evidence, however, is sufficient to support a conviction if the evidence and any reasonable inferences that may be drawn from such evidence establish the defendant's guilt beyond a reasonable doubt. *State v. Ellis*, 223 Neb. 779, 393 N.W.2d 719 (1986); *State v. Buchanan*, 210 Neb. 20, 312 N.W.2d 684 (1981).

It is not the responsibility of this court to resolve conflicts in the evidence, pass on the credibility of witnesses, or weigh the evidence. That is for the trier of fact, the jury in this case, and the jury verdict must be sustained if, taking the view most favorable to the State, there is sufficient evidence to support it. *State v. Kane, supra*. While there was evidence to the contrary, the evidence adduced by the State was sufficient to prove the defendant's guilt beyond a reasonable doubt. A review of the evidence discloses that admissible expert testimony was adduced showing that the injuries causing the victim's death were the result of having received blows to the head rather than having sustained them from a fall. The jury was properly instructed as to the weight to be given expert testimony. It was told it could adopt, or not, the conclusions of the experts. The jury chose to adopt those conclusions which supported the conviction.

There was also testimony with regard to the condition of the apartment. Such testimony, if believed, was consistent with the showing of a struggle in the apartment. Additionally, there was evidence of defendant's statement to the police that he did not mean to kill the victim; that he and Mrs. Witthoff had had an argument, although it was not "violent"; and defendant's volunteered statement that "I didn't try to kill the woman for crying out loud." We hold that the evidence in the case at bar, although largely circumstantial, is sufficient, when taken as a whole, to prove defendant's guilt beyond a reasonable doubt. The trial court did not err in refusing to grant defendant's motion for a directed verdict. There was sufficient evidence, if believed, to constitute proof beyond a reasonable doubt that defendant was guilty of the crime of manslaughter.

Insofar as defendant implies that the adducing of expert

testimony supporting a not guilty verdict renders the State's evidence insufficient to prove defendant's guilt beyond a reasonable doubt, this court has held to the contrary. In *State v. Miner*, 216 Neb. 309, 343 N.W.2d 899 (1984), we held that contradictory medical opinions only create credibility guidelines which, in the *Miner* case and in this case, the jury resolved against the defendant. Contradictory medical opinions as to the cause of death in a criminal case do not establish, of themselves, that the State has failed to prove the cause of death beyond a reasonable doubt. The resolution of such factual disputes is not subject to reconsideration on appeal.

Defendant also assigns as error the court's failure to grant a continuance for defense counsel to properly prepare for the testimony of one of the State's expert witnesses. Such a motion for a continuance of a trial is addressed to the sound discretion of the trial court, and that ruling will not be disturbed on appeal in the absence of a showing of an abuse of that discretion. *State v. Richter*, 221 Neb. 487, 378 N.W.2d 175 (1985); *State v. Broomhall*, 221 Neb. 27, 374 N.W.2d 845 (1985). The record shows the trial court required that the expert witnesses were made available to opposing counsel for questioning before their trial testimony, and every effort was made to accommodate counsel in connection with preparing for the testimony of the expert witnesses. Our reading of the record shows skilled cross-examination of the State's expert witnesses. Neither party was subjected to surprise testimony at the trial. We have held that there is no abuse of discretion by the trial court in denying a continuance unless it clearly appears that the defendant suffered prejudice as a result of that denial. *State v. Sluyter*, 224 Neb. 768, 401 N.W.2d 480 (1987). No prejudice to defendant clearly appeared in this case. With regard to the court's refusal to grant the continuance, we find no abuse of discretion, and therefore no error.

The defendant also assigns as error the court's refusal to grant a motion for new trial. Again, the granting or refusal of such a motion for a new trial is left to the sound discretion of the trial court, and in the absence of an abuse of that discretion the determination will not be disturbed. *State v. Bideaux*, 219 Neb.

718, 365 N.W.2d 830 (1985); *State v. Tainter*, 218 Neb. 855, 359 N.W.2d 795 (1984). Furthermore, the new evidence on which the motion is based must be of such a potent nature that it would have probably produced a substantially different verdict. *State v. Bideaux, supra; State v. Ferris*, 216 Neb. 606, 344 N.W.2d 668 (1984). The evidence on which this motion is based is an affidavit of Dr. Dawson regarding the testimony of Dr. Case. Dr. Dawson was one of the authors of a medical journal article concerning the "coup-contrecoup phenomenon," and his affidavit stated generally that he did not agree with the testimony of Dr. Case. That evidence had been directly refuted by evidence adduced by defendant, and the proposed Dawson testimony would have been subject to the scrutiny of the jury to the same extent as was the testimony of the other experts. We cannot say that it probably would have chosen to accept his conclusions over those of Dr. Case. The defendant presented evidence which would have supported an acquittal, and the Dawson testimony would have been cumulative. The record does not show that the verdict would have been different if the Dawson testimony was available. This assignment of error is without merit.

Finally, the defendant alleges the court abused its discretion in failing to sentence the defendant to probation. The granting of probation as opposed to imposing a jail sentence is a matter which is left to the sound discretion of the trial court. Absent a showing of abuse of that discretion, this court will not disturb the determination of the trial court. *State v. Kane*, 224 Neb. 245, 397 N.W.2d 628 (1986); *State v. Bovill*, 223 Neb. 764, 393 N.W.2d 715 (1986); *State v. Gillette*, 218 Neb. 672, 357 N.W.2d 472 (1984). The crime of manslaughter is a Class III felony, for which the maximum punishment is 20 years' imprisonment, or a $25,000 fine, or both. The minimum sentence is 1 year's imprisonment. The defendant was sentenced to 3 years' imprisonment. We hold the court did not abuse its discretion in failing to grant the defendant probation. The judgment and sentence of the lower court are affirmed.

Affirmed.