STATE OF NEBRASKA, APPELLEE, V. RONALD E. WILLIAMS, APPELLANT.

413 N.W.2d 907

Filed October 16, 1987. No. 86-1049.

Thomas M. Kenney, Douglas County Public Defender, and Timothy P. Burns, for appellant.

Robert M. Spire, Attorney General, and Lisa Martin-Price, for appellee.

HASTINGS, C.J., BOSLAUGH, WHITE, CAPORALE, SHANAHAN, and GRANT, JJ., and COLWELL, D.J., Retired.

BOSLAUGH, J.

The defendant, Ronald E. Williams, was charged with first degree murder and use of a firearm in the shooting death of Eric W. Holmes. Following a jury trial the defendant was found guilty of second degree murder and use of a firearm to commit a felony. He was sentenced to 20 years' imprisonment on the murder count and 3 years' (consecutive) imprisonment on the firearm charge.

On appeal the defendant's sole assignment of error is that the evidence was insufficient to sustain the conviction and that, therefore, the trial court erred in not sustaining his motions for a directed verdict and to dismiss the case. He argues that under the facts of this case it is clear as a matter of law that he was acting in self-defense and therefore the shooting was justified.

A trial court is justified in directing a verdict of not guilty only where there is a total failure of competent proof to support a material allegation in the information, or where the testimony is of so weak or doubtful a character that a conviction based thereon cannot be sustained. *State v. Dwyer, ante* p. 340, 411 N.W.2d 341 (1987); *State v. Meints*, 225 Neb. 335, 405 N.W.2d 15 (1987); *State v. Donnelson*, 225 Neb. 41, 402 N.W.2d 302 (1987).

In determining whether the evidence is sufficient to sustain a conviction, it is not the province of this court to resolve conflicts in the evidence, pass on the credibility of witnesses, determine the plausibility of the explanations, or weigh the evidence. Such matters are for the trier of fact, and the conviction must be sustained if, taking the view of the evidence most favorable to the State, there is sufficient evidence to support the conviction. *State v. Moore, ante* p. 347, 411 N.W.2d 345 (1987); *State v. Jacobs, ante* p. 184, 410 N.W.2d 468 (1987); *State v. Schreck, ante* p. 172, 409 N.W.2d 624 (1987); *State v. Nesbitt, ante* p. 32, 409 N.W.2d 314 (1987).

Neb. Rev. Stat. § 28-304 (Reissue 1985) provides in part that "[a] person commits murder in the second degree if he causes the death of a person intentionally, but without premeditation."

The state of mind required for second degree murder may be inferred from the evidence of the criminal act. *State v. Moniz*, 224 Neb. 198, 397 N.W.2d 37 (1986); *State v. Rowe*, 214 Neb. 685, 335 N.W.2d 309 (1983).

The record shows that on April 12, 1986, the victim, Eric Holmes, was living at Tim Agee's home at 4945 Manderson Street in Omaha, Nebraska. That evening a group of friends gathered at Agee's home for a get-together. Those at the party were Agee, Timothy Prince, Kelly Tibbs, Holmes, and Holmes' girlfriend, Michelle Tibbs. By around 11:30 p.m. everyone had left the house except for Holmes and Michelle.

Holmes and Michelle began to argue over possession of a blanket. Holmes told Michelle to get out and walk home, which she began to do. As she walked east up Manderson Street, she heard Holmes walking behind her. He caught up with her, and they again began to argue. Holmes grabbed her and tried to pull her back toward his house, but she pulled the other way. Holmes pushed her to the ground near a tree in front of the Roy Tipler home at 4828 Manderson Street and sat on top of her. Michelle began to cry and told Holmes to get off.

John Hudson and his mother, Linda Johnson, lived next door to Tipler. Hudson was hosting a birthday party for his girlfriend, Barbara Lawson, which the defendant, Ronald Williams, was attending. Hudson became aware of the altercation outside between Holmes and Michelle after several people complained to him. Hudson went outside and heard a woman gagging. He walked up the sidewalk to the tree and saw Holmes on top of Michelle. He told Holmes the police were coming and to get up and leave. Holmes did not get up, but remained on top of Michelle for approximately 3 more minutes. By this time other people had come outside to see what was happening. Holmes got off Michelle and stood up. Holmes and Michelle then walked east toward the Hudson home. By this time the defendant was also outside and heard Hudson and another man, Antonio Alexander, telling Holmes to leave. The defendant also heard Hudson's mother, Linda Johnson, tell Holmes to leave. Holmes replied to Johnson, "Fuck this shit, I'm not going anywhere, ain't nobody going to make me." Johnson told Holmes he had done enough already, to which he

replied that "he ain't done nothing yet."

The defendant then stepped in and told Holmes to leave. Holmes and the defendant began arguing back and forth. The defendant tried to go toward Holmes, but Hudson and Alexander restrained him. The defendant was then approximately 10 feet away from Holmes. The defendant appeared to calm down, so Hudson and Alexander let go of him. Holmes began walking west toward his house, but was walking backward so that he was still facing the defendant to the east.

They continued to exchange words, and when Holmes was approximately three to four houses away, Hudson and Alexander again had to restrain the defendant from going after Holmes. They were successful in restraining the defendant, so they again let go of him. Holmes, still walking backward, said, "Let him go. I got something for him." The defendant went toward Holmes again. Hudson tried to grab the defendant, but he broke away and ran up Manderson Street toward Holmes. At this point Holmes was in front of the home of Steven and Judy Gregory at 4848 Manderson, which was estimated to be around 100 yards from the tree in the Tipler yard where the Holmes-Michelle altercation took place.

The Gregorys had heard this altercation and had called 911 to report the disturbance. Judy Gregory testified that she and her husband were standing in the front doorway of their home watching Holmes and the defendant. She saw Holmes turn toward the defendant as the defendant came up from behind him. She saw Holmes put his hands up in the air and heard him say, "Man, I don't have anything." She then saw the defendant shoot Holmes. Holmes pulled up his shirt, looked at his chest, and said, "Man, you didn't have to shoot me." Holmes turned and ran west toward his house, while the defendant went east back toward the party. Judy Gregory testified that she never saw any kind of weapon in Holmes' possession. Steven Gregory also testified that he had seen Holmes with his hands in the air and that Holmes shouted, "I don't have anything" just before he was shot.

Others who were in front of the Hudson home gave a different version of the events in front of the Gregory home.

Bertha Jones testified that as the defendant approached Holmes, Holmes put his hand toward his jacket pocket and was bringing his hand back out when he was shot. Barbara Lawson testified Holmes did not put his hands in the air, but instead was bringing his hand toward his body when the defendant shot him. The defendant testified that Holmes had put his hand in his pocket and that he, the defendant, shot Holmes as Holmes was bringing his hand back out of his pocket. He also testified that he never saw a weapon on Holmes.

About 1:30 a.m. Timothy Prince went back to the Agee house and found Holmes lying on the couch with a bullet hole in his chest. The police were called, and Holmes was later pronounced dead.

Although the evidence was in conflict, it was sufficient to sustain a finding of guilty beyond a reasonable doubt. Taking the view of the evidence most favorable to the State, the evidence supports a finding by the jury that the defendant intentionally shot Eric Holmes. Two of the eyewitnesses to the shooting each testified that Holmes had his hands in the air and had stated, "I don't have anything" immediately prior to being shot. The defendant himself testified he never saw a weapon on the victim. This evidence was sufficient to support the conviction, and the judgment of the trial court must be affirmed.

AFFIRMED.