STATE OF NEBRASKA, APPELLEE, V. MICHAEL ZEMUNSKI, APPELLANT.

434 N.W.2d 520

Filed January 20, 1989.    No. 88-148.

Thomas M. Kenney, Douglas County Public Defender, and Timothy P. Burns for appellant.

Robert M. Spire, Attorney General, and James H. Spears for appellee.

HASTINGS, C.J., BOSLAUGH, WHITE, CAPORALE, SHANAHAN, GRANT, and FAHRNBRUCH, JJ.

CAPORALE, J.

Following a jury trial, defendant, Michael Zemunski, was convicted of burglary, a violation of Neb. Rev. Stat. § 28-507(1) (Reissue 1985), and sentenced accordingly. He appeals, assigning as error the trial court's failure to find the evidence insufficient to support the conviction. We affirm.

At approximately 2:45 a.m. on Friday, July 3, 1987, Omaha police were informed by a private security company that 11 burglar alarms had all stopped functioning at the same time, apparently due to disruption of telephone lines connecting the alarm systems to the security company offices. Of the 11 businesses whose alarms had ceased functioning, one near 120th and L Streets also suffered disruption of its regular telephone service. Although a telephone junction box in the area was found to have been vandalized, nothing amiss was discovered at the location of the business suffering disruption of its telephone service.

As he was leaving the grounds of the business with the disrupted telephone service, Officer Richard Shook happened to see a dark-haired white man, wearing dark-colored jeans and dark jean jacket, coming out of the back door of a restaurant at 120th and L Streets. The man crouched outside the restaurant's back door for a moment, then ran west around the building. Shook got into his cruiser and used his radio to alert other officers, and the chase was on.

Shook momentarily lost sight of the fleeing man as he navigated his cruiser in the man's direction. Another officer

spotted the man running in a nearby "ditch" (apparently a grassy draw or swale), and guided Shook toward the man by radio. Shook followed the radioed directions and found a dark-haired white man, dressed as described above, "[r]unning just as fast as he could." The man saw Shook approaching and turned to run into a nearby apartment building; he did not enter the building, however, perhaps because two other officers were there already. Instead, the man turned abruptly to run back the way he had come, toward the ever-approaching Shook, who shortly thereafter, with assistance from another officer and without again losing sight of the man, captured Zemunski. At the time of capture, Zemunski was out of breath and perspiring profusely. At trial, Shook stated that he was positive Zemunski was the man he had seen running from the restaurant.

The manager of the restaurant testified that when he left the premises at about 2 that morning, the front door, the office door, and the back door of the restaurant were all closed and locked, and the restaurant's safe was in an undamaged condition. Following Zemunski's capture, it was noted that the back door to the restaurant building had been pried open and was ajar. Just inside, the door to the restaurant office had been kicked open, and the safe in the office had been attacked in an apparent attempt to "peel" it open. A crowbar was found on the ground near the back door; the manager testified that it had not been there when he left. Tools found on the desk in the office, following Zemunski's capture, were not the restaurant's property, nor were they familiar to the manager.

Sand, metal, and paint particles were found atop the safe and on the office floor, and were collected by police. Following arrest, Zemunski's clothes were removed from him and sealed in a plastic bag. Analyses subsequently performed on Zemunski's clothing by an expert at the State Criminalistics Laboratory disclosed the presence of sand, metal, and paint particles; the paint particles were identical to those recovered from the crime scene.

Zemunski denied any involvement in the burglary of the restaurant, and testified that at about 3 a.m. on July 3, 1987, he left his residence in Council Bluffs, Iowa, intending to visit a friend in Lincoln before 6 a.m. He drove on Interstate 29 to L

Street when, at about 108th Street, he noticed he was short of fuel. He then crossed a bridge over the Interstate on L Street and turned into a parking lot at 120th Street, intending to turn around and go to a gas station. Zemunski, who seems prone to this sort of thing, see *State v. Zemunski, ante* p. 613, 433 N.W.2d 170 (1988), ran entirely out of gas in the parking lot. Unable to restart the vehicle, he pushed it into a parking space and went looking for a telephone.

Zemunski further testified that he intended to walk across the restaurant parking lot toward a nearby motel, but the arrival at that time of a police cruiser deterred him. As Zemunski explained it, "Well, with having a record and all that, I knew I would be detained if—if there was any problems in the area." Again, see *State v. Zemunski, supra.*

Zemunski walked instead through a "depression area," evidently the draw or swale referred to earlier, toward the intersection of 120th and L Streets. Suddenly, according to Zemunski, two individuals ran from the restaurant, across the parking lot, into the swale, and toward Zemunski. Zemunski hid behind a tree, and the two other individuals ran past him, out of the swale, and across the parking lot where Zemunski had left his vehicle. As a police cruiser approached, Zemunski started to run, too, following the two unknown individuals toward his vehicle and away from the police cruiser. Police officers then chased and captured Zemunski as outlined above.

This case is controlled by two oft-stated rules. The first is that in resolving a challenge to the sufficiency of the evidence to sustain a criminal conviction, the Supreme Court does not resolve conflicts in the evidence, pass on the credibility of witnesses, determine the plausibility of explanations, or weigh evidence. The State is entitled to have all its relevant evidence accepted or treated as true, every controverted fact as favorably resolved for the State, and the benefit of every favorable inference reasonably deducible from the evidence. *State v. Marrs, post* p. 977, 434 N.W.2d 336 (1989); *State v. Jones, post* p. 968, 434 N.W.2d 333 (1989). The second is that circumstantial evidence is sufficient to support a criminal conviction if such evidence and reasonable inferences drawn from the evidence establish the defendant's guilt beyond a

reasonable doubt. *State v. Jones, supra; State v. Wiggins, ante* p. 632, 432 N.W.2d 824 (1988).

Section 28-507(1) provides: "A person commits burglary if such person willfully, maliciously, and forcibly breaks and enters any real estate or any improvements erected thereon with intent to commit any felony or with intent to steal property of any value."

Clearly, the evidence adduced at trial was sufficient to support the jury's implicit conclusion that Zemunski had used a crowbar to break into the restaurant through the back door, and had kicked in the office door and attacked the safe within, using the tools later found there; that particles of sand, metal, and paint had adhered to Zemunski's clothing as he attacked the safe; that Zemunski was seen by Shook leaving the restaurant; and that he was subsequently captured following a brief chase.

Zemunski's assignment of error being without merit, we affirm.

AFFIRMED.