STATE OF NEBRASKA, APPELLEE, V. VELMA BATISTE, APPELLANT.

437 N.W.2d 125

Filed March 17, 1989.    No. 87-1153.

Arthur C. Toogood, Adams County Public Defender, for appellant.

Robert M. Spire, Attorney General, and Sharon M. Lindgren for appellee.

HASTINGS, C.J., BOSLAUGH, WHITE, CAPORALE, SHANAHAN, GRANT, and FAHRNBRUCH, JJ.

FAHRNBRUCH, J.

Velma Batiste appeals her first degree murder conviction resulting from the strangulation death of Patty Wolzen in Hastings, Nebraska. She was sentenced to life imprisonment. We affirm the defendant's conviction and sentence.

In her appeal to this court, Batiste's seven assignments of error may be summarized as follows: The trial court erred in failing to (1) grant her a speedy trial, (2) find there was insufficient evidence to convict her, (3) permit the defendant to reopen her case before the close of the trial, and (4) grant a new trial based on newly discovered evidence.

On Sunday morning, December 5, 1982, Patty Wolzen's 4-year-old daughter found her mother's lifeless body in the first floor bathroom of their apartment. The daughter alerted a neighbor. An ambulance was called, and the victim was taken to a hospital. After a pattern of contusions and abrasions was discovered on the dead woman's neck, the police were contacted. An autopsy disclosed that Wolzen had been manually strangled and had died from asphyxia.

Law enforcement officials immediately began an extensive murder investigation, but had no suspect for over 3 years. It was in February 1986, that Leonard Batiste, a brother-in-law of the defendant's, contacted the Adams County sheriff's office. He told authorities that Velma Batiste admitted to him that she had killed Wolzen. Leonard Batiste also said that the defendant, on more than one occasion, told him "she [Wolzen] got what she deserved" for having a sexual relationship with the defendant's husband.

Leonard Batiste further told law enforcement officials that a Geraldine Wallace was present when Wolzen was killed. Law enforcement officers, who had previously interviewed Wallace, reinterviewed her. At the second interview, she was known as Geraldine Wallace McGhee. She admitted being present at the beginning of the strangulation of Wolzen. McGhee said she lied during earlier interviews about the killing because she was afraid of Velma Batiste. McGhee was charged with, and

convicted of, false reporting, and thereafter was charged with failure to appear for her sentencing.

Velma Batiste was arrested and charged with killing Wolzen "purposely and with deliberate and premeditated malice," in violation of Neb. Rev. Stat. § 28-303(1) (Reissue 1985). An initial information setting forth the first degree murder charge was filed March 18, 1986, in the Adams County District Court. On October 27, 1986, the defendant filed a motion for discharge, claiming that she had not been brought to trial within 6 months from the filing of the information on March 18, 1986. On October 29, 1986, the State dismissed the case without prejudice because McGhee could not be found for the scheduled December 1, 1986, trial. Batiste was released from jail.

McGhee was apprehended on February 23, 1987. The first degree murder charge against Velma Batiste was refiled in the Adams County Court on June 18, 1987. On August 3, 1987, the defendant waived her right to a preliminary hearing and was bound over to the Adams County District Court for trial. A second information charging Batiste with murder in the first degree was filed in the Adams County District Court on August 11, 1987. On October 1, 1987, the defendant again filed a motion for discharge, claiming she had not been brought to trial within 6 months from March 18, 1986, the date when the first information was filed. The motion was denied.

Following a 5-day trial, the jury, on November 2, 1987, returned a verdict finding the defendant guilty of murder in the first degree. On December 16, 1987, she was sentenced to life imprisonment.

The defendant first complains that she was not given a speedy trial and, therefore, should have been set free. Neb. Rev. Stat. § 29-1207 (Reissue 1985) provides that a defendant must be brought to trial within 6 months from the date the information setting forth the charge is filed. In the computation of the 6-month period, the statute permits exclusion of any delay attributable to the defendant. Attributable to the defendant in this case were those times she used to depose witnesses and to process motions to suppress evidence, motions in limine, and motions to continue.

According to the trial court, the State was chargeable with 81 days from the time the first information was filed until it was dismissed. The court found that an additional 48 days were chargeable to the State for the period between when the second information was filed and the commencement of the trial. Thus, the State used a total of 129 days before bringing the defendant to trial, well within the allotted 6-month period.

The defendant does not complain that the court's time computations are inaccurate but, rather, that at least a portion of the time between the dismissal of the first information and the filing of the second information should be included in calculating the 6-month period. Batiste argues that once the witness McGhee was located, the information should have been refiled. She claims that the time between locating the witness and the filing of the second information should be included in the 6-month period.

In *State v. Torrence*, 192 Neb. 720, 224 N.W.2d 177 (1974), *cert. denied* 420 U.S. 928, 95 S. Ct. 1127, 43 L. Ed. 2d 399 (1975), the defendant, on March 6, 1972, was charged with possession of heroin. On March 15, 1972, following a preliminary hearing, the charges were dismissed. Thereafter, this court, in *State v. McElroy*, 189 Neb. 376, 202 N.W.2d 752 (1972), decided December 8, 1972, clarified the law regarding possession of controlled substances. The charge against Torrence was refiled on April 9, 1973. He was convicted at a trial that began October 22, 1973. On appeal, Torrence claimed he was denied a speedy trial. This court found that the period between the dismissal of the original charges and the refiling of the charges was not includable, even though the State waited 4 months from the *McElroy* decision before refiling the charges.

In Batiste's case, the time between the dismissal and refiling of the charge is not includable in calculating the 6-month time period set forth in § 29-1207. The defendant's first assignment of error is without merit.

Next, we address whether there was sufficient evidence to support a first degree murder conviction. Section 28-303(1) (Reissue 1985) provides that murder in the first degree is committed when a person kills another person purposely and with deliberate and premeditated malice.

The defendant claims that the record lacks sufficient evidence to convict her of killing Wolzen. She further claims that if the evidence is sufficient to prove her guilty of killing Wolzen, there is insufficient evidence to show it was accompanied by deliberate and premeditated malice. The defendant argues that the most the evidence shows is that the killing was a result of a sudden quarrel, and, therefore, she could only be convicted of manslaughter.

In reviewing the sufficiency of the evidence to sustain a criminal conviction, it is not the province of the Supreme Court to resolve conflicts in the evidence, pass on the credibility of witnesses, determine the plausibility of explanations, or weigh the evidence; such matters are for the finder of fact, and the verdict must be sustained if, taking the view most favorable to the State, there is sufficient evidence to support it.

*State v. Tatara*, 230 Neb. 279, 280, 430 N.W.2d 692, 694 (1988); *State v. Babcock*, 227 Neb. 649, 419 N.W.2d 527 (1988).

Taking the view most favorable to the State, the evidence justified the jury's finding beyond a reasonable doubt that the defendant killed Wolzen. McGhee, a friend of the defendant's, testified she was present and witnessed the beginning of Wolzen's strangulation by Batiste in the bathroom where Wolzen's body was found. McGhee left Wolzen's apartment and went to her own apartment in the same complex. Later, Batiste joined her. When the defendant left McGhee's apartment, McGhee returned to the Wolzen apartment and found Wolzen dead on the bathroom floor.

Velma Batiste admitted to her brother-in-law, Leonard Batiste, that she had killed Wolzen. Leonard testified that when he displayed shock and said, "Don't be saying things like that if you didn't do it. That's nothing to be joking about," Velma Batiste declared, "I swear to God I did it."

Some of Wolzen's neck injuries were caused by a person with long fingernails, according to the pathologist who performed the autopsy on Wolzen. At the time of the killing, Velma Batiste wore long fingernails. Scientific examination also disclosed there were no dissimilarities between a hair found on the robe Wolzen was wearing when she died and the hair of the

defendant. There were seven similarities.

Batiste's motive for killing Wolzen, although not an element of murder in the first degree, was established by the evidence beyond a reasonable doubt. McGhee testified that shortly before the victim was killed, Batiste accused Wolzen of having a sexual relationship with the defendant's husband. When Wolzen denied it, Batiste became upset. After Wolzen's death, Batiste told at least two people that Wolzen got what she deserved. Terrence Batiste, the defendant's husband, testified that he had been sexually intimate with Wolzen in the months prior to her death. From this and other evidence that will be related later, it is obvious that Wolzen was killed because of her sexual relationship with Batiste's husband.

McGhee testified that on the evening of the killing, while she was visiting with Wolzen in Wolzen's kitchen, Batiste appeared outside of some sliding doors. Wolzen let her into the kitchen. McGhee further testified that the three women were seated at the kitchen table talking when the victim got up and went into the bathroom. The defendant followed Wolzen into the bathroom. According to McGhee, "Velma asked Patty why she was denying it [sleeping with Velma's husband]." Then Batiste said she "was going to kill her," meaning Wolzen, McGhee testified. McGhee walked down the hallway and looked into the bathroom.

McGhee saw Batiste standing in front of Wolzen, who was facing the defendant. The witness testified that Batiste had her hands in the area of Wolzen's neck. McGhee said Wolzen was "gasping for air" and that Batiste appeared upset and was calling Wolzen a liar. It was at that point, McGhee testified, she left Wolzen's apartment. As previously recited, McGhee returned to Wolzen's apartment and found the victim dead on the bathroom floor.

Contrary to Batiste's claim, there was sufficient evidence from which a jury could find beyond a reasonable doubt that the defendant killed Wolzen.

The defendant argues that even if the evidence shows beyond a reasonable doubt that she killed Wolzen, the evidence is only sufficient to prove her guilty of manslaughter, i.e., killing Wolzen without malice upon a sudden quarrel, and not murder

in the first degree.

Section 28-303 provides in part that "[a] person commits murder in the first degree if he kills another person (1) purposely and with deliberate and premeditated malice."

Under the homicide statutes, whether a killing constitutes manslaughter or murder in the first degree depends upon the state of mind of the killer. When it is claimed that the killing was upon a sudden quarrel, there are three elements of the crime of manslaughter: (1) the killing of another, (2) upon a sudden quarrel, and (3) without malice. Neb. Rev. Stat. § 28-305 (Reissue 1985). The third element of manslaughter concerns the state of mind of the killer. "Malice," in a legal sense, denotes that condition of mind which is manifested by the intentional doing of a wrongful act without just cause or excuse. See, *State v. Rowe*, 214 Neb. 685, 335 N.W.2d 309 (1983); *State v. Hardin*, 212 Neb. 774, 326 N.W.2d 38 (1982); *Sall v. State*, 157 Neb. 688, 61 N.W.2d 256 (1953). Thus, to constitute manslaughter, the slayer must have no intention of doing the wrongful act of killing another without just cause or excuse. In the present case, Batiste does not argue that there was any legal just cause or legal excuse for the killing of Wolzen.

If the facts of a killing establish beyond a reasonable doubt that the killing is done intentionally without legal cause or excuse, then there is malice, and the degree of killing is greater than manslaughter because malice is involved. The facts developed by direct and circumstantial evidence concerning Wolzen's death clearly justified the jury in finding beyond a reasonable doubt a higher degree of homicide than manslaughter.

The evidence is overwhelming that Batiste killed Wolzen "purposely," one of the elements required to be proved beyond a reasonable doubt to convict a person of murder in the first degree. "Purposely" means "intentionally." *Pembrook v. State*, 117 Neb. 759, 222 N.W. 956 (1929). See *State v. Schott*, 222 Neb. 456, 462, 384 N.W.2d 620, 624 (1986), where, citing *State v. Coca*, 216 Neb. 76, 341 N.W.2d 606 (1983), we held: "*Intentionally* means willfully or purposely and not accidentally or involuntarily."

Whether intent, premeditated malice, or deliberate malice is

present when the actor kills another depends upon the actor's state of mind and mental processes. Intent, like any mental process or other state of mind of a defendant, may be proved not only by direct but also by circumstantial evidence and the inferences to be drawn therefrom. See *State v. Hoffman*, 227 Neb. 131, 416 N.W.2d 231 (1987). The law is settled that independent evidence of specific intent is not required. The intent with which an act is committed is a mental process and may be inferred from the words and acts of the defendant and from the circumstances surrounding the incident. *State v. Costanzo*, 227 Neb. 616, 419 N.W.2d 156 (1988).

McGhee testified that before committing the act of killing Wolzen, Batiste had declared she "was going to kill" the victim. It was after that statement that Wolzen was killed. A babysitter for Batiste's children testified that a few days after Wolzen was killed, Batiste told her that on the day before the killing, the defendant had gone to Wolzen's apartment with a knife. The babysitter quoted Batiste as saying that the victim "was lucky she wasn't there or didn't answer the door."

The babysitter further testified that about a week before the killing, the defendant had appeared "really mad" because the defendant and her husband "wanted to try and get things back together and that Patty was in the way." The babysitter said Batiste told her that "[s]he [Wolzen] had better keep her white ass out of it, or she would keep it out for her." Wolzen was of the white race. The defendant and her husband are of the black race. Deborah Kuhlman Kruse, a friend of Wolzen's, testified that a couple of weeks prior to her death, Wolzen said she told Terry Batiste to stay away, but he kept coming to see her. Wolzen said, "I don't want her [Batiste] to come in and knock me around my kitchen no more."

While Velma Batiste and Wolzen were in the bathroom, McGhee testified, she heard "a hit, like skin hitting flesh." The autopsy revealed a hemorrhage on the right side of the scalp tissue and in the muscle overlying the bone in the right temple. It was caused by blunt force being applied to the area, according to the pathologist.

In finding a defendant guilty beyond a reasonable doubt, a jury may rely upon circumstantial evidence and the inferences

that may be drawn therefrom. *State v. Zemunski*, 230 Neb. 954, 434 N.W.2d 520 (1989); *State v. Jones*, 230 Neb. 968, 434 N.W.2d 333 (1989). Therefore, the length of time it takes to strangle another may be considered significant in determining the intent of the killer.

The testimony of the pathologist, Dr. Jerry Jones, who performed the autopsy on Wolzen, is illuminating on this point. He testified in part:

The time frame from the time that strangling began, until the episode or assault would end, would be a period of many minutes. You can't strangle someone in a short period of time. A person may become unconscious, perhaps within 30 seconds or so, but they will not be killed in this period of time. It takes many minutes in order to kill somebody.

People who have admitted to strangling people have indicated that three or four minutes later, if they have released the pressure, that person will begin to breathe again and the heart rate is still going.

So pressure has to continue to be applied for perhaps up to ten to thirteen minutes or more, continually, in order to effectively kill somebody. During this period, again, the heart will be beating so that although there is nothing absolutely as far as a time frame in my opinion, from my experience, and knowing the medical-legal literature, that it would take a period of many minutes. At least four to five minutes, and perhaps up to nine, ten or thirteen minutes or more in order to effectively strangle somebody and to kill them.

The pathologist also testified:

It would take a person with a great deal of intent and anger, and continual pressure, to produce the injuries present. These are extraordinary in the sense that they are also so extensive on the surface of the skin, and also in the tissues underneath. So, again, in my opinion, this would indicate a great deal of pressure. It would not indicate necessarily the size of the individual.

Batiste's statements that "Patty [Wolzen] was in the way," that "[s]he [Wolzen] had better keep her white ass out of it, or

she would keep it out for her," that the victim "got what she deserved" for having a sexual relationship with the defendant's husband, and that she (Batiste) was going to kill Wolzen, together with the defendant's prior acts of knocking Wolzen around and of going to Wolzen's apartment with a knife the day before the killing and then stating that the victim "was lucky she wasn't there or didn't answer the door," are words and conduct from which a jury could conclude beyond a reasonable doubt that Batiste intentionally killed Wolzen.

The type and severity of the injuries to Wolzen's neck, the injuries to the victim caused by blunt force, and the length of time it takes to kill a person by strangulation leave no doubt that Batiste intended to kill her victim.

Having found there was sufficient evidence to convict the defendant of intentionally killing Wolzen, we now focus on whether there was sufficient evidence for a jury to determine beyond a reasonable doubt that Batiste had the deliberate and premeditated malice required to convict her of murder in the first degree.

To constitute murder in the first degree, there must have been an unlawful killing done purposely and with deliberate and premeditated malice. § 28-303.

"Deliberate malice" and "premeditated malice" are separate and distinct elements of the crime of murder in the first degree. *Pembrook v. State*, 117 Neb. 759, 222 N.W. 956 (1929).

"Deliberate" means not suddenly, not rashly; but deliberation requires that the defendant considered the probable consequences of his or her act before doing the act. See NJI 14.10. Cf. *Pembrook v. State, supra* (for origin of language). A person kills with "deliberate malice" when he or she, without just cause or excuse, kills another not suddenly or rashly, but after considering the probable consequences of doing the act.

"Premeditated" means to have formed a design to commit an act before it is done. See Neb. Rev. Stat. § 28-302 (Reissue 1985). A person kills with "premeditated malice" if before the act causing the death occurs, he or she has formed the intent or determined to kill the victim without legal justification. *State v. Kern*, 224 Neb. 177, 397 N.W.2d 23 (1986). In *State v. Benzel*,

220 Neb. 466, 470, 370 N.W.2d 501, 506-07 (1985), this court stated:

> The question of premeditation was for the jury to determine. *State v. Jones*, 217 Neb. 435, 350 N.W.2d 11 (1984). No particular length of time for premeditation is required, provided that the intent to kill is formed before the act is committed and not simultaneously with the act that caused the death. *Jones, supra*; *State v. Nokes*, 192 Neb. 844, 224 N.W.2d 776 (1975); *Savary v. State*, 62 Neb. 166, 87 N.W. 34 (1901). The time needed for premeditation may be so short as to be instantaneous; the intent to kill may be formed at any moment before the homicide is committed. *State v. Bautista*, 193 Neb. 476, 227 N.W.2d 835 (1975); *Nokes, supra*.

See, also, *State v. Kern, supra*.

Batiste's prior statements, her prior acts, and her declared intent to kill Wolzen immediately before committing the act show that Batiste had consciously formed the intent or determined to kill Wolzen without legal justification. The facts show that Batiste did not suddenly or rashly kill Wolzen. The facts show that before Batiste killed Wolzen, she considered the probable consequences of doing the act. From the evidence, the jury could find beyond a reasonable doubt that Batiste acted with deliberate malice and premeditated malice in killing Wolzen.

The defendant next argues that the court erred by refusing to reopen the case to allow additional testimony. A motion to reopen a criminal case to allow introduction of further evidence is addressed to the discretion of the trial court. See, *State v. Packett*, 206 Neb. 548, 294 N.W.2d 605 (1980); *State v. Crouch*, 205 Neb. 781, 290 N.W.2d 207 (1980); *State v. Pratt*, 197 Neb. 382, 249 N.W.2d 495 (1977).

The testimony the defendant wished to present was that of DeAnn Patterson Ginn, who had previously testified in the State's case in chief. The purpose of recalling Ginn was to clarify whether her earlier testimony related to threats or advice from Batiste. The State objected to recalling Ginn for the purposes stated by defense counsel, and the objection was sustained.

Additional testimony by Ginn would have been repetitive of evidence already in the record. Ginn's original testimony gives no indication that she perceived Batiste's comments to her to be threats. Therefore, the trial court's refusal to reopen the case to allow Ginn's testimony presents no abuse of discretion.

The defendant's final assignment of error alleges that the trial court erred in overruling a motion for a new trial based upon newly discovered evidence.

Denial of a motion for new trial based on newly discovered evidence is controlled by our holding in *State v. Bideaux*, 219 Neb. 718, 365 N.W.2d 830 (1985), that a motion for new trial on the ground of newly discovered evidence is addressed to the discretion of the trial court, and unless an abuse of discretion is shown, its determination will not be disturbed. See, *State v. Donnelson*, 225 Neb. 41, 402 N.W.2d 302 (1987); *State v. Todd*, 226 Neb. 906, 416 N.W.2d 13 (1987).

Neb. Rev. Stat. § 29-2103 (Reissue 1985) provides:

In any criminal case where it shall be made to appear upon the motion of the defendant for a new trial, supported by affidavits, depositions or oral testimony, that the defendant has discovered new evidence material to his defense which he could not with reasonable diligence have discovered and produced during the term within which the verdict upon which he was sentenced was rendered, the district court may set aside such sentence and grant a new trial . . . .

This court has stated that new evidence in support of such motion " ' "must be so potent that, by strengthening evidence already offered, a new trial would *probably* result in a different verdict." ' " *State v. Bideaux, supra* at 726, 365 N.W.2d at 835; *State v. Pittman*, 210 Neb. 117, 313 N.W.2d 252 (1981). See, also, *State v. Hortman*, 207 Neb. 393, 299 N.W.2d 187 (1980). The newly discovered evidence must be relevant and credible, and not merely cumulative. *State v. Peery*, 205 Neb. 271, 287 N.W.2d 71 (1980); *State v. Munson*, 204 Neb. 814, 285 N.W.2d 703 (1979).

At the hearing on the motion for a new trial, Sherrie Thaut, a neighbor of Wolzen's, testified that during the evening of December 4, 1982, she saw a blue pickup truck leave the front

of Wolzen's apartment complex and back into a driveway across the street. Thaut also testified that after Wolzen's funeral she saw Terry Wolzen, the victim's estranged husband, driving a blue pickup. Thaut said Terry Wolzen's pickup looked like the one she had seen turning around in the driveway on December 4, 1982.

During cross-examination, the witness admitted that she had merely seen the pickup turn around on the night of December 4, 1982, but had never observed it parked in front of Patty Wolzen's apartment. Thaut did not identify the driver or passengers of the pickup. Additionally, Thaut testified that she did not know whether the pickup truck that she saw on December 4, 1982, was the same one that she saw driven by Terry Wolzen. Thaut admitted that she did not know much about pickups.

Prior to Batiste's trial, Thaut had been interviewed by investigating officers. A report of that interview provided, in part, that "Cherie [sic] also stated that she had seen, once in a while, a light blue pickup. She had seen it leave Saturday night after 0100 hrs." An investigator for the public defender testified that he had reviewed the law enforcement reports concerning Thaut's testimony and had interviewed Thaut at one time, but there had been no further followup regarding Thaut's knowledge of any relevant events.

Clearly, the defendant was aware of Thaut's report of seeing a blue pickup in the area of Wolzen's apartment. That information was not acted upon until after trial. After reviewing the evidence which Thaut presented to the court at the hearing on the motion for new trial, we cannot see how this evidence would be relevant to the defendant's case or is of such probative value that its introduction would be likely to change the result. The ruling of the trial court is well within the limits of its discretion and consequently will not be disturbed.

We have reviewed all of defendant's assignments of error and find them to be without merit. The conviction and sentence of the district court are affirmed.

AFFIRMED.