STATE OF NEBRASKA, APPELLEE, V. SYLVESTER FRANK PETTIT, APPELLANT.
445 N.W.2d 890

Filed September 22, 1989.    No. 88-492.

John O. Sennett and Brad Roth, of Sennett & Roth, for appellant.

Robert M. Spire, Attorney General, and Lynne R. Fritz for appellee.

HASTINGS, C.J., BOSLAUGH, WHITE, CAPORALE, SHANAHAN, GRANT, and FAHRNBRUCH, JJ.

SHANAHAN, J.

A jury found Sylvester "Frank" Pettit guilty of manslaughter in the death of his wife, Pandora Pettit. Neb. Rev. Stat. § 28-305(1) (Reissue 1985) provides: "A person commits manslaughter if he kills another without malice, either upon a sudden quarrel, or causes the death of another unintentionally while in the commission of an unlawful act." The court sentenced Pettit to imprisonment for 4 to 12 years.

Frank Pettit claims that the district court erred by overruling Pettit's motion for directed verdict at the conclusion of evidence and in refusing to instruct on "accident" regarding Pandora Pettit's death. Frank Pettit also contends that the district court committed reversible error by allowing amendment of the information initially filed, admitting evidence over Pettit's relevance objections (photographs taken in conjunction with the autopsy on Pandora Pettit, rifle ammunition found at the scene of the fatality, Pettit's .44-caliber pistol, and testimony concerning Pettit's physical appearance), and imposing an excessive sentence.

## BACKGROUND FOR THE FATALITY

Frank and Pandora Pettit were married in July 1982. Frank Pettit drank alcohol to excess and frequently changed jobs. On New Year's Eve for 1986, Frank Pettit and his cousin, with whom Pettit had grown up, attended a dance. During the course of that evening, Frank's cousin committed suicide, apparently by gunshot. Later, Frank tried to take his own life, but his suicide weapon, a gun, misfired. In August 1986, Frank and Pandora Pettit began working for the Shinn Turkey Ranch, where Frank mixed feed for turkeys and loaded live turkeys for shipment on trucks. Pandora took care of brooder turkeys and helped Frank load turkeys for shipment. The couple lived with Pandora's children from a previous marriage, namely, Scott, age 13, and Shelly, age 12, in a house provided by and located on the Shinn ranch. The Pettit home did not have a telephone. According to Doug Shinn, Pettits' employer, Frank Pettit did not exhibit a drinking problem during employment by Shinn.

Although Shinn never saw Frank Pettit with a firearm, Frank owned two guns, a .22-250 caliber Remington Model

788, a high velocity bolt-action rifle; and a .44-caliber, black powder, cap-and-ball pistol. Donald Roberts, who was Pettits' neighbor for 5 months before Pandora's death, never observed Frank Pettit intoxicated or saw Frank Pettit act belligerently toward, or otherwise threaten, Pandora. Although Pettits had difficulty in paying their debts and sometimes argued about their financial condition, Frank Pettit never struck Pandora during their arguments.

On January 15, 1987, an extremely cold day, Frank and Pandora were working on the Shinn ranch. Around 3 p.m., Pettits and other Shinn employees began loading turkeys for shipment, work which continued until 9:30 p.m., when Pettits received their paychecks. Pandora, who received the checks for Pettits, lost the checks, which irritated Frank because the cold and dark hindered finding the checks among the turkey feathers at the loading site. After a 10-minute search, Pettits found their checks and, after dismantling the loading equipment, returned to their home around 10 p.m. Pandora took a warm bath. Frank, who was "pretty well wound up," began drinking cherry vodka and scotch while listening to music. Later, Pettits argued about Frank's drinking. After four or five drinks, Frank decided to drive to town for more liquor. Pandora accompanied Frank, who took his .44-caliber pistol on the trip to town. En route, Pettits' car ran out of gas, and the couple started to walk across a field on the return to their home. Pettit gave his insulated nylon jacket to Pandora and attempted to carry her across a rough field, but kept falling down. When Pettits finally reached their home, Frank passed out in the front yard. Pandora went into the house and returned outside with Scott and Shelly to assist in taking Frank into the house. While Pandora and the children were helping Frank enter the house, he awoke and pointed the .44 pistol at "something" in nearby bushes, only to discover that the "something" was Hubert, the family's dog. Pettits and the children entered the house. Scott and Shelly went to bed, Pandora went somewhere within the house, and Frank entered Pettits' 9- by 11-foot bedroom through its only access, a door at the room's southwest corner. A bed was located in the northwest corner of the room opposite the doorway. A dresser stood against the bedroom's east wall.

## THE SHOOTING

According to Frank Pettit, he entered the bedroom with the intention to commit suicide, put the pistol in a dresser drawer, started his tape player for music, and took his rifle from behind the bedroom door. Then Frank Pettit sat on the edge of the bed and "jacked a shell in the rifle," that is, Pettit operated the bolt-action to deliver a live round from the cartridge clip or magazine to the breech and cock the rifle's hammer for firing. The cartridge clip or magazine fits into a magazine floor plate, which is located immediately ahead of the rifle's trigger guard. After he had armed the rifle, Pettit placed the butt of the rifle on the floor between his legs with the rifle's muzzle near his head. At that point, Pandora entered the bedroom and started arguing with Frank about his obvious and present effort to commit suicide. Frank pushed Pandora from the bedroom and again sat on the side of the bed, placing the butt of the rifle on the floor with the rifle's muzzle under his chin. Pandora reentered the room, grabbed the rifle from Frank, and threw it over Frank's right shoulder as she exclaimed: "Frank, don't. Frank, don't. Frank, stop. Stop, Frank. Stop, Frank." The hurled rifle landed behind Frank on the bed. Still seated on the edge of the bed, Frank retrieved the rifle and, with his knees bent and his feet on the floor, lay back on the bed. The rifle's barrel pointed generally to the left of Frank Pettit as the rifle lay across Frank's legs at his knees. The couple continued to argue about Frank's prospective suicide. Pandora finally convinced Frank to forgo suicide and began to take off the nylon jacket she was wearing. According to Frank Pettit:

> [Pandora] told me finally that if, tomorrow, I still wanted to commit suicide, that she wouldn't want to stand in my way, and convinced me to wait until tomorrow, and at that point, she started to take off her coat and stuff, and I went ahead and started to sit up and pick up the rifle, and at the same time I went to pull the clip out of the rifle, and that's when it went off.

Frank caught Pandora as she fell, placed her on the floor with her head toward the bedroom's west wall, and tried to comfort her.

Ten to 15 seconds after Scott had heard Pandora exclaim,

"Stop, Frank," or "Don't, Frank," he heard a shot and thought that Frank Pettit had committed suicide. Shelly and Scott went to the Pettit bedroom and found Pandora lying on the floor with Frank Pettit at her side. Frank told the children to go next door to the Roberts residence and call an ambulance. After doing so, Scott returned to the Pettit bedroom, where Pandora, shortly before she died, said to Scott: "Don't worry. I'm not going to die. It was an accident. I love you."

Roberts, the neighbor, came to the Pettit house and found Pandora lying on the bedroom floor with Frank's jacket wrapped around her left arm. Roberts picked up the rifle from the floor at Pandora's left side, leaned the rifle against the bedroom wall, and observed Frank Pettit, kneeling at Pandora's right side and trying to stanch the flow of Pandora's blood by inserting a piece of plastic into the bullet wound in Pandora's chest. Pandora was conscious but was experiencing "pretty bad pain." Although Pandora stopped breathing, Frank tried, without avail, to administer mouth-to-mouth resuscitation to Pandora, who was dead when the ambulance appeared.

When police arrived, they found the rifle leaning against the bedroom wall. There was an expended cartridge in the rifle's chamber, a live round in the rifle's clip, and an unspent rifle cartridge on the floor near the corner of the dresser where Frank Pettit had placed his pistol. Police found rifle ammunition in the dresser drawer. Nothing indicated a scuffle or struggle in the Pettit bedroom. The police believed that Frank Pettit was sober. Pandora Pettit's body lay adjacent to the bed with her arms extended westward over her head.

## FRANK PETTIT'S TRIAL

*The Information.*

In the information on which the case was tried, the State, basically in the language of § 28-305(1), charged that Frank Pettit did "unlawfully and feloneously [sic], kill another, to-wit: one Pandora Pettit, without malice, either upon a sudden quarrel, or cause the death of another, to-wit: one Pandora Pettit, unintentionally while in the commission of an unlawful act . . . ."

The "unlawful act" alleged in the information was criminal assault in the third degree, a violation of Neb. Rev. Stat. § 28-310(1)(b) (Reissue 1985), which states: "A person commits the offense of assault in the third degree if he [or she] . . . [t]hreatens another in a menacing manner."

*Evidence.*

During his testimony, Frank Pettit acknowledged that he and Pandora had been quarreling about his suicidal effort just before the shooting and that during the argument or quarrel, Pandora had convinced Frank not to commit suicide. Frank Pettit did not recall whether he had released the safety on the rifle that evening as a step toward suicide and could not recollect how many live rounds were in the rifle's clip or magazine when the weapon discharged. However, Frank Pettit was adamant that he never aimed the rifle at Pandora Pettit, pointed the weapon at Pandora "with the intention to hurt her," had his finger on the rifle's trigger when the weapon discharged, or intended to shoot Pandora. Pettit asserted that the shooting was "unintentional" and "accidental" because "I was raising the gun with one hand at the same time that I was sitting up, and that I was also pulling the clip out or attempting to" when the rifle discharged.

A forensic firearms specialist negated malfunction of Frank Pettit's rifle. The rifle had a properly functioning safety located on the stock behind the bolt. If the safety is engaged to prevent discharge of the rifle, the safety could be released by motion in the direction of the muzzle, such as thumb pressure exerted on the safety. When pressure of $3^1/2$ to $3^3/4$ pounds was applied to the rifle's trigger, the cocked hammer was released and drove the firing pin against the cartridge in the weapon's breech. Such trigger action was in accordance with the manufacturer's standards and was otherwise acceptable for Frank Pettit's rifle, which showed no susceptibility for accidental discharge through "shocks" or "jolts" to the rifle. Examinations disclosed no gunpowder residue on Pandora's body and indicated that the rifle's muzzle was at least 15 inches from the nylon jacket when the rifle fired. The bullet hole in the jacket did not align with the wound in Pandora's chest unless the jacket were elevated somewhat on Pandora's torso, indicating that when the bullet struck Pandora, she had raised her arms

above her head or had elevated her arms while she was removing the jacket.

An autopsy established that Pandora's death was caused by a bullet's destruction of the upper lobe of her right lung and that there were no bruises or contusions on Pandora's body except for the bullet wound. According to the pathologist, "The bullet entered the body in a perpendicular plane. If one assumes a body as being upright and the bullet goes almost straight in in this fashion." On entry into Pandora's body, the bullet struck her third and fourth ribs, which may have deflected the bullet from a straight path and caused the bullet to fragmentate. Bone fragments from her shattered ribs punctured Pandora's lung. However, the pathologist acknowledged that the bullet's perpendicular path to Pandora's torso could mean that the bullet was fired at a slightly upward angle if Pandora happened to be bending at the waist when the bullet entered her body. The pathologist concluded:

> There is no way that — from the autopsy, that we can tell what position Mrs. Pettit was in when this bullet struck her, so whether she was vertical or horizontal, I can't tell, but I can tell that from that plane of her body, the bullet entered in a perpendicular fashion to whatever plane her body was in.

As a witness for Pettit, a psychiatrist testified without objection that, on the night Pandora Pettit was shot, Frank Pettit was suicidal and "suffered the disease of alcoholism to a severe degree" and further testified that Frank Pettit "would not willfully . . . or intentionally harm or kill Pandora."

At the close of all the evidence, the court overruled Pettit's motion for a directed verdict or dismissal of the charges against Pettit.

*Instructions.*

The court denied Pettit's requested instruction:

> If the shot which caused the death of Pandora Pettit was wholly accidental so far as the Defendant was concerned and not while the Defendant was in the commission of an unlawful act, your verdict should be not guilty. To warrant a verdict of guilty the State must satisfy you beyond a reasonable doubt that the weapon, at the time and place in question was not accidentally discharged

or if accidentally discharged that the Defendant was then engaged in an unlawful act directly connected therewith.

The court instructed the jury that to convict Frank Pettit of manslaughter, the State was required to prove beyond a reasonable doubt that Frank Pettit "killed Pandora Pettit [and that] he did so without malice, either upon a sudden quarrel, or unintentionally, while he was in the commission of some unlawful act." Regarding the "unlawful act" mentioned in the foregoing instruction, the court informed the jury: "An assault in the third degree is, under the Nebraska Criminal Code, an unlawful act within the meaning of the manslaughter statute. 'Assault in the Third Degree' is committed by threatening another person in a menacing manner." The court gave an additional instruction in the language of § 28-305(1): "A person commits manslaughter if he kills another without malice, either upon a sudden quarrel, or causes the death of another unintentionally while in the commission of an unlawful act." Concerning the manslaughter charge against Frank Pettit for Pandora Pettit's death "upon a sudden quarrel," the court gave no instruction relative to "accident" or intent to kill as an element of manslaughter based "upon a sudden quarrel."

In his summation, the prosecutor noted the absence of an instruction on "accident" and argued:

What is — what's the defense that has been offered to you? Isn't the defense based on the evidence and argument from counsel that this was an accident? The statute doesn't say it's not the crime of manslaughter if it is an accident, does it? If you accept as truth everything that the defendant told you on the witness stand, he is guilty of manslaughter because this took place under or upon — upon is the language of the statute — that this took place upon a sudden quarrel. You don't find accident as a defense in the statute . . . .

The jury returned a verdict that Frank Pettit was guilty of manslaughter as charged.

### NEBRASKA'S MANSLAUGHTER STATUTE AND DUE PROCESS CONSIDERATIONS

Readily apparent in the Nebraska manslaughter statute,

§ 28-305(1), is the definition of a criminal homicide, expressed in an inclusive disjunction, namely: "A person commits manslaughter if he kills another without malice, either upon a sudden quarrel, *or* causes the death of another unintentionally while in the commission of an unlawful act." (Emphasis supplied.)

Clearly, the second of the statutory alternatives in § 28-305(1) prohibits a person's killing another "unintentionally while in the commission of an unlawful act," but the first of the manslaughter statute's alternatives is silent concerning intent to kill as an element of manslaughter "upon a sudden quarrel." One construction of § 28-305(1) might be that since the situations for manslaughter are expressed in the alternative or inclusive disjunction, the explicit statement of "unintentionally" killing another, expressed in the second of the alternative situations for manslaughter, means that the first of the statutory alternatives requires the element of an intentional killing as opposed to the unintentional killing in the second of the alternative situations for manslaughter. However, if the first of the alternative situations expressed in § 28-305(1) does not require an intentional killing as an element of manslaughter, absence of criminal intent results in strict responsibility for a killing "upon a sudden quarrel."

Although Pettit concedes that intent to kill is not required for violation of the second of the alternatives stated in § 28-305(1), he contends that intent to kill is a requisite element for manslaughter "upon a sudden quarrel." On the other hand, the State argues, in essence, that intent to kill is not an element of manslaughter "upon a sudden quarrel," that is, anyone causing another's death "upon a sudden quarrel" is strictly liable for the offense of manslaughter. Therefore, we must determine whether manslaughter "upon a sudden quarrel" requires the element of intent to kill or whether strict accountability for another's death "upon a sudden quarrel" eliminates intent to kill as an element of the felony designated as "manslaughter."

In determining whether criminal intent is an element of manslaughter "upon a sudden quarrel," we bear in mind the general rule that "criminal statutes are interpreted as requiring criminal intent, and this is particularly true in situations in

which the offense involved is a felony." *United States v. O'Brien*, 686 F.2d 850, 853 (10th Cir. 1982). As the U.S. Supreme Court has observed:

> The contention that an injury can amount to a crime only when inflicted by intention is no provincial or transient notion. It is as universal and persistent in mature systems of law as belief in freedom of the human will and a consequent ability and duty of the normal individual to choose between good and evil. A relation between some mental element and punishment for a harmful act is almost as instinctive as the child's familiar exculpatory "But I didn't mean to," and has afforded the rational basis for a tardy and unfinished substitution of deterrence and reformation in place of retaliation and vengeance as the motivation for public prosecution.

*Morissette v. United States*, 342 U.S. 246, 250-51, 72 S. Ct. 240, 96 L. Ed. 288 (1952). See, also, *United States v. United States Gypsum Co.,* 438 U.S. 422, 437, 98 S. Ct. 2864, 57 L. Ed. 2d 854 (1978): "Although Blackstone's requisite 'vicious will' has been replaced by more sophisticated and less colorful characterizations of the mental state required to support criminality, [citation omitted], intent generally remains an indispensable element of a criminal offense."

The fact that a statutory definition of a crime may not include reference to the accused's mental state does not necessarily negate intent ("mens rea") as an element for a crime.

> [T]he holding in *Morissette* can be fairly read as establishing, at least with regard to crimes having their origin in the common law, an interpretive presumption that *mens rea* is required. "[M]ere omission . . . of intent [in the statute] will not be construed as eliminating that element from the crimes denounced"; instead Congress will be presumed to have legislated against the background of our traditional legal concepts which render intent a critical factor, and "absence of contrary direction [will] be taken as satisfaction with widely accepted definitions, not as a departure from them." [Citation omitted.]

While strict-liability offenses are not unknown to the criminal law and do not invariably offend constitutional requirements [citation omitted], the limited circumstances in which Congress has created and this Court has recognized such offenses [citations omitted] attest to their generally disfavored status.

*United States v. United States Gypsum Co., supra* at 438 U.S. at 437-38 (quoting *Morissette v. United States, supra*). See, also, *United States v. Anton*, 683 F.2d 1011, 1017 (7th Cir. 1982): mere omission of intent as an element of a felony does not justify dispensing with intent as an element of the crime because " ' "[t]he existence of a *mens rea* is the rule of, rather than the exception to, the principles of Anglo-American criminal jurisprudence." ' " (Quoting *United States v. United States Gypsum Co., supra*); *State v. Jennings*, 150 Ariz. 90, 94, 722 P.2d 258, 262 (1986): "Strict liability offenses are the exception rather than the rule and will only be found where there is a clear legislative intent not to require any degree of mens rea"; *State v. Jones,* 242 Kan. 385, 391-92, 748 P.2d 839, 845 (1988):

When an act is prohibited and made punishable by statute, the statute is to be construed in the light of the common law. The existence of a criminal intent is regarded as essential even though the terms of the statute do not require it, unless it clearly appears that the legislature intended to make the act criminal without regard to the intent with which it was done.

Violation of some criminal statutes may occur without a defendant's criminal intent, if such type of statutes

omits mention of intent and where it seems to involve what is basically a matter of policy, where the standard imposed is, under the circumstances, reasonable and adherence thereto properly expected of a person, where the penalty is relatively small, where the conviction does not gravely besmirch, where the statutory crime is not taken over from the common law, and where congressional purpose is supporting, the statute can be construed as one not requiring criminal intent. The elimination of this element is then not violative of the due process clause.

*Holdridge v. United States*, 282 F.2d 302, 310 (8th Cir. 1960). We note that the penalty for manslaughter is a maximum sentence of 20 years' imprisonment, a $25,000 fine, or both such imprisonment and fine and that the minimum penalty for manslaughter is 1 year's imprisonment. See § 28-305(2) and Neb. Rev. Stat. § 28-105(1) (Reissue 1985). Thus, when the penalty for violation of a statute is severe or conviction for violation of the statute may irreparably damage the defendant's reputation, elimination of criminal intent as an element necessary for violation of a statute may violate due process. See *United States v. Wulff*, 758 F.2d 1121 (6th Cir. 1985).

With that backdrop, we proceed to analyze the crime of manslaughter in Nebraska.

### MANSLAUGHTER AT COMMON LAW

As this court observed in *State v. Hutter*, 145 Neb. 798, 801-02, 18 N.W.2d 203, 206-07 (1945):

> An historical approach seems necessary to secure an adequate discussion of the subject. There were no degrees of murder or manslaughter at common law. All criminal homicide was either murder or manslaughter, but the latter was included in the former as a constituent element thereof, or it might exist as a distinct offense where there was no malice aforethought. At common law, murder is the unlawful killing of a person with malice aforethought, either express or implied, and manslaughter is the unlawful killing of another without malice express or implied. Manslaughter differs from murder in the want of malice, a condition of the blood or mind at the time of the act. This distinction is the only one that the accumulated wisdom of the common law deemed it advisable to make.

Hence, at common law, two types of criminal homicide existed: murder and manslaughter. Under common law, murder was the unlawful killing of another human being with malice aforethought and was punishable by death, while manslaughter was the unlawful killing of another without malice and carried a penalty less than death. Consequently, the element of malice, the intention to do a wrongful act without just cause or excuse, distinguished murder from manslaughter

at common law. 2 W. LaFave & A. Scott, Substantive Criminal Law §§ 7.1(a), 7.9, and 7.10(h) (1986). Accordingly, under common law, malice was necessary for murder, and the absence of malice was necessary for manslaughter.

Although the common-law crime of murder was accompanied by an intent to kill and was, therefore, characterized as a voluntary homicide, courts began to recognize an intentional homicide committed under extenuating circumstances which mitigate, but do not justify or excuse, the killing, that is, adequate legal provocation which causes a reasonable individual to lose his or her normal self-control, thereby reducing the homicide from murder to "voluntary" manslaughter. 2 W. LaFave & A. Scott, *supra*, § 7.10.

> The usual type of voluntary manslaughter involves the intentional killing of another while under the influence of a reasonably-induced emotional disturbance (in earlier terminology, while in a "heat of passion") causing a temporary loss of normal self-control. Except for this reasonable emotional condition, the intentional killing would be murder.

2 W. LaFave & A. Scott, *supra*, § 7.10(a) at 254.

> Voluntary manslaughter is an intentional killing in the heat of passion as a result of severe provocation. As a concession to human frailty, a killing, which would otherwise constitute murder, is mitigated to voluntary manslaughter.
>
> Although, given severe provocation, the impairment of a defendant's capacity for self-control may be substantial, the offense is only mitigated, not excused; if there were no punishment at all, there would be no incentive for an enraged person to make an effort to control his emotions. It must be remembered that this is not a killing in self-defense; it is not "necessary" for the provoker to be killed. The provoker is not completely innocent of wrongdoing, but the law cannot tolerate the taking of his life.

2 C. Torcia, Wharton's Criminal Law § 153 at 236-38 (14th ed. 1979).

In the Model Penal Code § 210.3(b) at 43 (1962), criminal homicide constitutes manslaughter when "a homicide which would otherwise be murder is committed under the influence of extreme mental or emotional disturbance for which there is reasonable explanation or excuse."

As noted in the Model Penal Code, murder and manslaughter were distinguished at common law because "homicide, even if intentional, was said to be without malice and hence manslaughter if committed in the heat of passion upon adequate provocation." Model Penal Code, § 210.3, comment 1 at 44 (1962).

Concerning provocation which reduced the criminal homicide from murder to manslaughter,

> [p]rovocation nevertheless survived as a rule of mitigation for intentional homicides committed in certain extenuating circumstances . . . . A sudden rage, however engendered, does not necessarily or even probably negate an intent to kill. More likely it reinforces the firmness of the actor's resolve to take the life of another. At most, therefore, provocation affects the quality of the actor's state of mind as an indicator of moral blameworthiness. Provocation is thus properly regarded as a recognition by the law that inquiry into the reasons for the actor's formulation of an intent to kill will sometimes reveal factors that should have significance in grading. It is a concession to human weakness and perhaps to non-deterability, a recognition of the fact that one who kills in response to certain provoking events should be regarded as demonstrating a significantly different character deficiency than one who kills in their absence.

Model Penal Code § 210.3, comment 5(a) at 54-55 (1962).

Thus, under common-law principles, adequate legal provocation eliminated malice from murder and reduced an unlawful homicide from murder to manslaughter. See *State v. Cooper*, 273 N.C. 51, 159 S.E.2d 305 (1968). See, also, *Barrett v. Commonwealth*, 231 Va. 102, 341 S.E.2d 190 (1986) (malice and heat of passion are mutually exclusive). For that reason, the phrase "without malice," in reference to voluntary manslaughter, does not mean "without intention," but means a

"willful act, characterized by the presence of an intent to kill . . . ." *People v. Brubaker*, 53 Cal. 2d 37, 44, 346 P.2d 8, 12 (1959). In *Boche v. State*, 84 Neb. 845, 854, 122 N.W. 72, 75 (1909), this court mentioned a definition for common-law manslaughter: " 'The unlawful killing of another, without malice . . . upon a sudden heat; or inadvertently, but in the commission of some unlawful act.' "

Another type of criminal homicide which occurred without malice, but which courts sought to punish at common law, was involuntary manslaughter—the defendant's unintentionally killing another during the commission of an unlawful act. Malice was absent from the homicide characterized as "involuntary manslaughter" because the defendant did not intend to kill the victim. However, the defendant's intention to commit the underlying unlawful act supplied the mens rea in a crime for the misdemeanor manslaughter analog to the felony murder rule. 2 W. LaFave & A. Scott, Substantive Criminal Law § 7.13 (1986).

## MANSLAUGHTER IN NEBRASKA

There are no common-law crimes in Nebraska. *State v. Douglas*, 222 Neb. 833, 388 N.W.2d 801 (1986); *Kinnan v. State*, 86 Neb. 234, 125 N.W. 594 (1910).

Within constitutional boundaries, the Legislature is empowered to define a crime and punish a person's conduct expressly declared to be criminal. See, *State v. Douglas, supra*; *State v. Ewert*, 194 Neb. 203, 230 N.W.2d 609 (1975); *State v. Tucker*, 183 Neb. 577, 162 N.W.2d 774 (1968). However, the meaning of words or phrases used in reference to common-law crimes may be helpful in determining the meaning, intent, or effect of a statute which does not contain an express definition of terms in the statute. *State v. Mattan*, 207 Neb. 679, 300 N.W.2d 810 (1981); *State v. Eynon*, 197 Neb. 734, 250 N.W.2d 658 (1977); *State v. De Wolfe*, 67 Neb. 321, 93 N.W. 746 (1903).

For Nebraska statutes, the Legislature has drawn from the common law to define the crime of manslaughter. Nebraska's initial statute on manslaughter, Rev. Stat. §§ 21 to 24 (1866), provided:

Manslaughter is the unlawful killing of a human being,

without malice, express or implied, and without any deliberation whatever. It must be voluntary, upon a sudden heat of passion, caused by a provocation apparently sufficient to make the passion irresistible or involuntary, in the commission of an unlawful act, or a lawful act without due caution or circumspection.
§ 21.

In cases of voluntary manslaughter, there must be a serious and highly provoking injury inflicted upon the person killing, sufficient to excite an irresistible passion in a reasonable person, or an attempt by the person killed to commit a serious personal injury on the person killing.
§ 22.

The killing must be the result of that sudden, violent impulse of passion, supposed to be irresistible; for if there should appear to have been an interval between the assault or provocation given and the killing, sufficient for the voice of reason and humanity to be heard, the killing shall be attributed to deliberate revenge, and punished as a murder.
§ 23.

Involuntary manslaughter shall consist in the killing of a human being without any intent so to do, in the commission of an unlawful act, or a lawful act, which probably might produce such a consequence, in an unlawful manner: *Provided, always*, That where such involuntary killing shall happen in the commission of an unlawful act, which, in its consequences, naturally tends to destroy the life of a human being, or is committed in the prosecution of a felonious intent, the offense shall be deemed and adjudged to be murder.
(Emphasis in original.) § 24.

In 1873, however, by Gen. Stat. § 5 (1873), the Legislature amended the manslaughter statute and defined the crime as follows: "If any person shall unlawfully kill another without malice, either upon a sudden quarrel, or unintentionally, while the slayer is in the commission of some unlawful act, every such person shall be deemed guilty of manslaughter . . . ." Noteworthy is the fact that in enacting the 1873 manslaughter

statute, the Nebraska Legislature drew extensively from the criminal code of Ohio. See *Morgan v. State*, 51 Neb. 672, 71 N.W. 788 (1897). Construing the Ohio statutory progenitor of the 1873 Nebraska manslaughter statute, the Supreme Court of Ohio stated in *John Sutcliffe v. The State*, 18 Ohio 469, 476 (1849):

> [T]he entire description of the offence is embraced in these words, to wit: that if any person shall unlawfully kill another without malice, either upon a sudden quarrel or unintentionally, while the slayer is in the commission of some unlawful act; every such person shall be deemed guilty of manslaughter; Swan's Stat. 229. It is evident that the Legislature had in their view, while framing the enactment above quoted, the crime of manslaughter, as well understood at the common law. They have adopted it in substance, and almost in form.

The statutory definition of manslaughter, contained in the General Statutes of 1873, was substantially carried into Comp. Stat. § 28-403 (1929): "Whoever shall unlawfully kill another without malice, either upon a sudden quarrel, or unintentionally, while the slayer is in the commission of some unlawful act, shall be deemed guilty of manslaughter . . . ."

As a part of the Nebraska Criminal Code, enacted in 1977, § 28-305(1) contained the current definition of manslaughter: "A person commits manslaughter if he kills another without malice, either upon a sudden quarrel, or causes the death of another unintentionally while in the commission of an unlawful act." As noted in *State v. Hutter*, 145 Neb. 798, 802-03, 18 N.W.2d 203, 207 (1945):

> The different degrees of homicide as defined by our statute are all carved out of murder and manslaughter as known to the common law. No new offense has been created, and no homicide which was not criminal at common law is made so by statute, but it is divided into degrees and the punishment graded to meet the circumstances of the particular case. The decisions of this court clearly hold to this view.

In light of the foregoing, § 28-305(1) establishes and distinguishes the two categories of manslaughter: an unlawful

killing, without malice "upon a sudden quarrel," which may be characterized as voluntary manslaughter, and an unlawful but unintentional killing, without malice, as the result of the defendant's commission of an unlawful act, which may be characterized as involuntary manslaughter.

As used in § 28-305(1), the phrase "sudden quarrel" does not necessarily mean an exchange of angry words or an altercation contemporaneous with the unlawful killing and does not require a physical struggle or other combative corporal contact between the defendant and the victim. See *State v. Vosler*, 216 Neb. 461, 345 N.W.2d 806 (1984). Rather, in relation to manslaughter, a sudden quarrel is a legally recognized and sufficient provocation which causes a reasonable person to lose normal self-control, or, as expressed in *Savary v. State*, 62 Neb. 166, 175, 87 N.W. 34, 37-38 (1901),

> whether the defendant acted under the impulse of passion suddenly aroused which clouded the reason and prevented rational action . . . whether there existed reasonable and adequate provocation to excite the passion of the defendant and obscure and disturb his power of reasoning to the extent that he acted rashly and from passion, without due deliberation and reflection, rather than from judgment . . . .

See, also, *State v. Rincker*, 228 Neb. 522, 423 N.W.2d 434 (1988), wherein Rincker, carrying a hunting knife, entered a house, discovered his wife on a bed between two naked men, and stabbed to death the victim, one of the men who was on the bed with Rincker's wife. The State charged Rincker with first degree murder on account of the victim's death, that is, premeditated criminal homicide in violation of Neb. Rev. Stat. § 28-303(1) (Reissue 1985). Notwithstanding that Neb. Rev. Stat. § 29-2027 (Reissue 1985) provides in part, "In all trials for murder the jury before whom such trial is had, if they find the prisoner guilty thereof, shall ascertain in their verdict whether it be murder in the first or second degree, or manslaughter," Rincker contended that the trial court, without request, should not have instructed on manslaughter. This court responded to Rincker's contention: "The jury could well have concluded from the evidence that Rincker's wife was lying on the bed

between the victim and Siegrist and that Rincker reacted to that scene *without any prior intention* to kill the victim. That alone required the trial court to instruct the jury concerning manslaughter." (Emphasis supplied.) 228 Neb. at 534, 423 N.W.2d at 442. In view of the first degree murder charge in *Rincker*, this court's expression "*without any prior intention* to kill the victim," when placed in proper context, clearly refers to Rincker's reaction without premeditation in slaying the victim.

In reference to manslaughter, defined by the General Statutes of 1873 of the State of Nebraska, this court stated in *Boche v. State*, 84 Neb. 845, 854, 122 N.W. 72, 75 (1909):

> [T]o convict a defendant of manslaughter, it must be proved either that the killing was done in a sudden quarrel, or while the slayer was in the commission of some unlawful act . . . . In the first class of cases referred to in the statute the homicide must have been intentional, but in sudden passion or heat of blood caused by a reasonable provocation, and without malice; in the latter clause the killing must have been unintentional, but caused while the slayer was committing some act prohibited by law . . . .

(Emphasis omitted.)

In *Egbert v. State*, 113 Neb. 790, 799, 205 N.W. 252, 256 (1925), this court approved an instruction which informed the jury in a manslaughter case that

> "to warrant a verdict of guilty [for the crime of manslaughter] the state must satisfy you beyond a reasonable doubt that the revolver at the time and place in question was not accidentally discharged, or, if accidentally discharged, that the defendant was then in the commission of an unlawful act directly connected therewith . . . ."

The instruction approved in *Egbert* must be read in relation to our decisions in which we have considered a criminal assault with a weapon, that is, a defendant's commission of an unlawful act, in reference to an unlawful killing characterized as involuntary manslaughter; for example, see, *State v. Bachkora*, 229 Neb. 421, 427 N.W.2d 71 (1988): defendant claimed that the gun he was holding discharged accidentally, killing the victim; held, an instruction on "accidental" killing

was not required because the defendant admitted pointing the gun at the victim, an act which was a criminal assault and, therefore, an unlawful act which resulted in the homicide; *State v. Drew*, 216 Neb. 685, 687-88, 344 N.W.2d 923, 925 (1984):

> [T]he focus of the inquiry is not whether the gun discharged *accidentally* but, rather, whether the defendant was acting lawfully at the time the gun discharged. The defendant must establish that the use of the gun was privileged at the time it discharged. The threatening use of a firearm is an unlawful assault sufficient to convict one of manslaughter, when defined as causing the death of another unintentionally while in the commission of an unlawful act. § 28-305(1). Similarly, the accidental discharge of a gun, the use of which was not justified under the circumstances, is not a defense to manslaughter when the killing occurred upon a sudden quarrel.

(Emphasis in original); *Ford v. State*, 71 Neb. 246, 98 N.W. 807 (1904): although the defendant believed that the gun was unloaded, the defendant's pointing the gun at the victim constituted a criminal assault as the basis for a manslaughter conviction.

*State v. Worley*, 178 Neb. 232, 132 N.W.2d 764 (1965), illustrates that in an appropriate factual setting, a jury must decide whether a homicide constitutes murder in the second degree, that is, a person causes another's death intentionally without premeditation (Neb. Rev. Stat. § 28-304 (Reissue 1985)), or whether the homicide is voluntary or involuntary manslaughter. In *Worley*, the defendant, alone in his girlfriend's house, where he awaited her return, fired a pistol at some figurines in the bedroom. As Worley was reloading the weapon, the doorbell rang. On answering the door, Worley found his girlfriend, Lucy, in the company of Ralph Gomez. Worley expressed his concern about what he believed to be the couple's inordinately long absence from the house. After seating himself on a divan, Worley began manipulating the pistol, which appeared to be jammed, when he was approached by Gomez with raised hands. As Worley was handling the apparently jammed pistol, the weapon discharged. When Worley started to get up from the divan, the pistol fired again. Gomez fell to the

floor and died of multiple gunshot wounds in his chest. Although Worley was charged with second degree murder, the jury found him guilty of manslaughter, that is, "killing of another without malice, either upon a sudden quarrel or unintentionally while the slayer is in the commission of some unlawful act." 178 Neb. at 235, 132 N.W.2d at 767. In reviewing the factual background for the discharge of the pistol in Worley's hand, the court stated: "We believe this evidence alone was sufficient for the jury to reach a conclusion that the killing occurred upon a sudden quarrel and in the heat of passion. The lack of intent, as well as intent itself, is a matter peculiarly within the jury's province." 178 Neb. at 236, 132 N.W.2d at 767.

After examining the evidence of "intent" in relation to the charge of manslaughter "upon a sudden quarrel," the *Worley* court then directed its attention to manslaughter in the commission of an unlawful act and expressed the following:

> The court also instructed the jury that the defendant could be found guilty of manslaughter if he shot and killed Gomez while in the commission of an unlawful act of assault and battery. From the same circumstances set out above, the jury possibly could have found that the defendant assaulted Gomez with the weapon in his hand without necessarily rendering the commission of the homicide intentional. Malice, intent, or purpose may be inferred from the shooting of another person with a deadly weapon. But not every assault with a deadly weapon in hand is necessarily conclusive proof of intent or a design to effect death. To come within the provisions of the manslaughter statute, the killing must not have been intentional or with a design to effect death. [Citation omitted.] . . . The question of whether he [Worley] was engaged in an assault on the deceased, and whether it was done with the intent to kill, is peculiarly within the province of the jury.

*Id.* However, because the State, over Worley's valid objection, introduced prejudicial hearsay regarding Worley's firing the fatal shots into Gomez, the court set aside Worley's conviction and remanded the cause for a new trial.

Courts of other jurisdictions have considered manslaughter

statutes which contain language quite similar to the "sudden quarrel" provision in § 28-305(1). In *People v. Brubaker*, 53 Cal. 2d 37, 346 P.2d 8 (1959), the Supreme Court of California examined Cal. Penal Code § 192 (West 1970), which provided:

Manslaughter is the unlawful killing of a human being, without malice. It is of three kinds:

1. Voluntary—upon a sudden quarrel or heat of passion.

2. Involuntary—in the commission of an unlawful act, not amounting to a felony . . . .

3. In the driving of a vehicle—

(a) In the commission of an unlawful act, not amounting to a felony, with gross negligence . . . .

(b) In the commission of an unlawful act, not amounting to a felony, without gross negligence . . . .

The California court concluded:

Voluntary manslaughter is a willful act, characterized by the presence of an intent to kill, *engendered by sufficient provocation* and by the absence of premeditation, deliberation and . . . malice aforethought. Section 192, subdivision 1, of the Penal Code defines voluntary manslaughter as the unlawful killing of a human being, without malice, "upon a sudden quarrel or heat of passion."

To be sufficient to reduce a homicide to manslaughter, the heat of passion must be such as would *naturally be aroused* in the mind of an *ordinary, reasonable person* under the given facts and circumstances, or in the mind of a person of *ordinary self-control*. [Citation omitted.]

(Emphasis in original.) 53 Cal. 2d at 44, 346 P.2d at 12.

Under New Mexico's statute, N.M. Stat. Ann. § 30-2-3 (Supp. 1984), manslaughter was defined: "Manslaughter is the unlawful killing of a human being without malice. A. Voluntary manslaughter consists of manslaughter committed upon a sudden quarrel or in the heat of passion." In *State v. Lopez*, 79 N.M. 282, 442 P.2d 594 (1968), Lopez and one of his longtime acquaintances had an argument. Shortly after the argument Lopez was seated behind the driver's wheel of his automobile when the "decedent" opened the driver's door, and, almost

instantaneously, a gunshot from within the vehicle felled the victim. Lopez testified that he did not intend to shoot the victim and did not know how or why the gun he was holding discharged. Lopez contended that the victim had grabbed hold of Lopez's jacket and right arm in a manner that such contact might have caused the gun to discharge. On appeal, Lopez argued that the evidence was insufficient to sustain his manslaughter conviction. However, the court, noting the dispute in testimony concerning the fatal occurrence, held that there was sufficient evidence to sustain a conviction for voluntary manslaughter and stated:

> We have not overlooked appellant's argument that the killing was accidental, based upon his testimony that he did not intend to pull the trigger, and didn't intend to shoot. That an accidental killing will not support a conviction of voluntary manslaughter goes without saying. However, just because the appellant testified to this effect does not make it so. The evidence is not undisputed, as contended by appellant.

*Id.* at 285, 442 P.2d at 597.

The Supreme Court of Wyoming, in *Searles v. State*, 589 P.2d 386 (1979), construed Wyo. Stat. § 6-58 (1957), which contained: "Whoever unlawfully kills any human being without malice, expressed or implied, either voluntarily, upon a sudden heat of passion, or involuntarily . . . ." The court in *Searles* stated: "In order to sustain a conviction for voluntary manslaughter, the wrongful act of killing must have been intentional. [Citation omitted.] An accidental killing is not voluntary manslaughter. [Citation omitted.]" 589 P.2d at 389.

Idaho's manslaughter statute, Idaho Code § 18-4006 (1979) provided: "Manslaughter is the unlawful killing of a human being, without malice. It is of two kinds: 1. Voluntary—upon a sudden quarrel or heat of passion. 2. Involuntary . . . ." The Idaho court decided that "[t]he elements of voluntary manslaughter are: (a) an unlawful killing, with (b) the intent to kill, but without malice." *State v. Atwood*, 105 Idaho 315, 318, 669 P.2d 204, 207 (1983). See, also, *Commonwealth v. Pitts*, 486 Pa. 212, 404 A.2d 1305 (1979) (voluntary manslaughter involves the defendant's intentional or voluntary act, that is,

"involves the specific intent to kill but, by reason of passion and provocation, contains no legal malice." 404 A.2d at 1308).

Thus, other courts, construing manslaughter statutes which have language substantially similar, if not identical, to the language of § 28-305(1), have agreed with this court's expression in *Boche v. State*, 84 Neb. 845, 854, 122 N.W. 72, 75 (1909), regarding voluntary manslaughter, that is, killing another, without malice, "upon a sudden quarrel," namely: "the homicide must have been intentional, but in sudden passion or heat of blood caused by a reasonable provocation, and without malice . . . ." We note that *Boche* has never been overruled.

Consequently, we hold that, to sustain a conviction for voluntary manslaughter under § 28-305(1), that is, a conviction for killing another, without malice, "upon a sudden quarrel," the State, by evidence beyond a reasonable doubt, must prove that the defendant intended to kill, and did kill, another. Thus, intentional criminal homicide as the result of legally recognized provocation distinguishes voluntary manslaughter "upon a sudden quarrel" from another intentional criminal homicide, murder in the second degree, namely, "A person commits murder in the second degree if he causes the death of a person intentionally, but without premeditation." § 28-304.

This court, in *Bohanan v. The State*, 15 Neb. 209, 18 N.W. 129 (1883), set aside Bohanan's manslaughter conviction because the trial court erroneously denied a hearing on Bohanan's plea in abatement, wherein Bohanan asserted that the grand jury which returned the indictment against Bohanan was illegally constituted. As stated in *Bohanan*: "For the error in denying the prisoner a trial on the issue taken on his plea in abatement, the judgment must be reversed, the verdict set aside, and the cause remanded to the court below for further proceedings conformable to this opinion." 15 Neb. at 215, 18 N.W. at 131. Notwithstanding its determination that reversible error existed as the result of the trial court's refusal to grant a hearing on Bohanan's plea in abatement, the court, in dicta pertaining to one of Bohanan's tendered instructions rejected by the trial court, found general suitability in an instruction: " 'Manslaughter is the unlawful killing of another without

malice, either express or implied, which may be either involuntary, upon a sudden heat of passion, or inadvertently, upon the commission of some unlawful act.' " *Id.* As noted, however, the comment in *Bohanan* concerning the tendered instruction is dicta. Also, some 25 years after *Bohanan*, but construing the same manslaughter statute which existed when *Bohanan* was decided, this court unequivocally stated that, concerning a criminal homicide involved in manslaughter which occurred "in a sudden quarrel," the "homicide must have been intentional, but in a sudden passion or heat of blood caused by a reasonable provocation and without malice . . . ." *Boche v. State, supra* at 854, 122 N.W. at 75. Thus, remarks about manslaughter in *Bohanan* are unquestionably dicta and, nevertheless, were superseded by the court's dispositive statement on manslaughter in *Boche*.

In *State v. Batiste*, 231 Neb. 481, 437 N.W.2d 125 (1989), Batiste was convicted of first degree murder on account of the victim's strangulation death. Batiste contended that the evidence was insufficient to sustain her murder conviction and that the evidence showed only the basis for a manslaughter conviction for a "killing [which] was a result of a sudden quarrel." 231 Neb. at 486, 437 N.W.2d at 129. In *Batiste*, we concluded: "The facts developed by direct and circumstantial evidence concerning [the victim's] death clearly justified the jury in finding beyond a reasonable doubt a higher degree of homicide than manslaughter," 231 Neb. at 488, 437 N.W.2d at 130; but, having determined that there was sufficient evidence to sustain Batiste's murder conviction, we, nevertheless, expressed: "Thus, to constitute manslaughter, the slayer must have no intention of doing the wrongful act of killing another without just cause or excuse." *Id.*

As a result of today's decision, reaffirming *Boche v. State, supra*, we disapprove of the language in *Batiste* to the effect that an intentional killing is not an element of voluntary manslaughter described in § 28-305(1).

Today's decision, however, does not alter our position that an unintentional killing "while in the commission of an unlawful act" is manslaughter proscribed by § 28-305(1). See *State v. Bachkora*, 229 Neb. 421, 427 N.W.2d 71 (1988).

## SUFFICIENCY OF EVIDENCE

Pettit argues that the evidence is insufficient to submit the manslaughter question to the jury.

"On a defendant's motion to dismiss for insufficient evidence of the crime charged against such defendant, the State is entitled to have all its relevant evidence accepted or treated as true, every controverted fact as favorably resolved for the State, and every beneficial inference reasonably deducible from the evidence."

*State v. Pierce*, 231 Neb. 966, 970, 439 N.W.2d 435, 439-40 (1989). See, also, *State v. Watkins*, 227 Neb. 677, 419 N.W.2d 660 (1988).

In a criminal case a court can direct a verdict only when (1) there is a complete failure of evidence to establish an essential element of the crime charged, or (2) evidence is so doubtful in character, lacking probative value, that a finding of guilt based on such evidence cannot be sustained.

*State v. Pierce, supra* at 970, 439 N.W.2d at 440. See, also, *State v. Watkins, supra.*

A defendant may be convicted by circumstantial evidence which establishes the defendant's guilt beyond a reasonable doubt. The State is required to establish the defendant's guilt for the crime charged, but is not required to disprove every hypothesis consistent with the defendant's presumed innocence.

*State v. Blue Bird*, 232 Neb. 336, 339, 440 N.W.2d 474, 476 (1989).

Intent is the state of the actor's mind when the actor's conduct occurs. *State v. Craig*, 219 Neb. 70, 361 N.W.2d 206 (1985). "*Intentionally* means willfully or purposely, and not accidentally or involuntarily." *State v. Schott*, 222 Neb. 456, 462, 384 N.W.2d 620, 624 (1986). The intent involved in conduct is a mental process and may be inferred from the conduct itself, the actor's language in reference to the conduct, and the circumstances surrounding an incident. *State v. Schott, supra.* "When an element of a crime involves existence of a defendant's mental process or other state of mind of an accused, such

elements involve a question of fact and may be proved by circumstantial evidence." *State v. Hoffman*, 227 Neb. 131, 140, 416 N.W.2d 231, 237 (1987).

*State v. Pierce, supra* at 971, 439 N.W.2d at 440.

It is without reasonable dispute that Frank Pettit's rifle was pointed in the direction of Pandora Pettit when the weapon discharged unless the fatal bullet was a ricochet. During the period shortly before the shooting, whether there was an argument about Frank Pettit's excessive drinking is unclear, but, clearly, Frank Pettit and Pandora Pettit dramatically discussed their very marked differences of opinion concerning Frank's taking his own life. However, in reference to Frank Pettit's conduct, Pandora Pettit's exclamation, "Frank, don't. . . . Stop, Frank," is equivocal. Did the exclamation relate to the rifle intentionally pointed or aimed at Pandora Pettit—a criminal assault? See § 28-310(1)(b). Or was the exclamation directed toward Frank Pettit's effort to commit suicide? Also, approximately 15 seconds elapsed between Pandora Pettit's exclamation and the fatal gunshot.

Physical evidence in Frank Pettit's trial was susceptible to various interpretations. A perpendicular path of the bullet into Pandora Pettit's body may indicate that Pandora was standing upright and that Frank Pettit was also standing upright when the rifle discharged, substantiating a theory that Frank Pettit was aware that he was aiming or pointing the rifle at Pandora and intentionally fired the fatal shot at her. On the other hand, it may be that Pandora Pettit, as she was removing the nylon jacket, leaned over or near Frank Pettit as he was attempting to extract the clip or magazine from the rifle, a situation which might account for lack of alignment between the bullet hole in the jacket and the wound in Pandora Pettit's chest. Perhaps in acute alarm or pathetic protection, Pandora Pettit was raising her hands above her head, when the rifle discharged, thus explaining the lack of alignment between the bullet hole in the jacket and the mortal wound. There may be other theories and inferences based on the evidence, but the equivocality of the evidence, which we have indicated, presented the jury with the question: How did the shooting occur? The court correctly overruled Frank Pettit's motion for directed verdict and

dismissal of the charges against Pettit.

## INSTRUCTION ON VOLUNTARY MANSLAUGHTER

Frank Pettit claims error in the court's refusal to give the tendered instruction on "accident."

> To establish reversible error from a court's refusal to give a requested instruction, an appellant has the burden to show that (1) the appellant was prejudiced by the court's refusal to give the tendered instruction; (2) the tendered instruction is a correct statement of the law; and (3) the tendered instruction is warranted by the evidence.

*Burns v. Veterans of Foreign Wars*, 231 Neb. 844, 853, 438 N.W.2d 485, 491 (1989).

"A trial court, whether requested or not, must instruct the jury on the law of the case, and failure to do so constitutes prejudicial error." *State v. Pierce*, 231 Neb. 966, 975, 439 N.W.2d 435, 443 (1989).

In *Hendricks v. Commonwealth*, 550 S.W.2d 551 (Ky. 1977), the court rejected the defendant's contention that "accident" was a defense to a charge of voluntary manslaughter and stated:

> That a killing was purely accidental is not a "defense" which, under the Penal Code, must be negated if there is evidence to raise it. [Citation omitted.] It is simply a denial that the act was done with the culpable state of mind required by the instructions as a condition precedent to a consideration. Hence, it was not necessary to give a defensive instruction on the theory of accident, because in order to find the appellant guilty the jury necessarily had to negate the explanation (rather than "defense") of accidental killing. [Citation omitted.]

550 S.W.2d at 553.

We agree with the analysis of the Supreme Court of Kentucky concerning the claimed "defense" of "accident" and conclude that "accident" is not a defense to the crime of voluntary manslaughter under § 28-305(1), but does relate to intent to kill, which is an element of the crime of manslaughter committed "upon a sudden quarrel." Therefore, if a court instructs the jury that intent to kill is an element of voluntary manslaughter committed "upon a sudden quarrel," and

otherwise sufficiently defines *intent* or *intentional* relative to the defendant's conduct, the trial court is not required to give a separate instruction on the theory of accident pertaining to the homicide which is the subject of the manslaughter charge against a defendant.

Without our reiterating each item of evidence in Frank Pettit's case, including Pandora's statement shortly before her death, "It was an accident," there was evidence which, if believed, negated Frank Pettit's intention to kill Pandora Pettit, an intent which is an element of voluntary manslaughter categorized in § 28-305(1)—an intentional killing of another, without malice, "upon a sudden quarrel." Under the circumstances, the district court should have instructed the jury that a finding of intent to kill was required to convict Frank Pettit of voluntary manslaughter committed "upon a sudden quarrel." Because Frank Pettit was charged in the alternative, that is, voluntary or involuntary manslaughter, the general verdict supplies no means to ascertain whether the jury found Frank Pettit guilty of involuntary manslaughter rather than voluntary manslaughter. Any further attempted analysis of the verdict would be based on absolute speculation. We are, therefore, unable to conclude that absence of an instruction on intent to kill, as an element of voluntary manslaughter, is harmless error. "Harmless error exists in a jury trial of a criminal case when there is some incorrect conduct by the trial court which, on review of the entire record, did not materially influence the jury in a verdict adverse to a substantial right of the defendant." *State v. Watkins,* 227 Neb. 677, 686, 419 N.W.2d 660, 666 (1988). See, also, *State v. Cox,* 231 Neb. 495, 437 N.W.2d 134 (1989). For that reason, failure to instruct on intent to kill as an element of voluntary manslaughter constitutes reversible error and requires our setting aside the manslaughter conviction of Frank Pettit.

### FRANK PETTIT'S OTHER ASSIGNED ERRORS

We have reviewed the record and find that Frank Pettit's other assignments are without merit and, under the circumstances, do not warrant discussion. Consequently, because we have found reversible error in the trial court's failure

to instruct on the voluntary manslaughter charge against Frank Pettit, we need not discuss the assignments of error pertaining to amendment of the information, adduction of evidence, and the allegedly excessive sentence.

REVERSED AND REMANDED FOR A NEW TRIAL.

FAHRNBRUCH, J., dissenting.

Because the majority of the court abolishes a critical distinction between the crime of second degree murder and the crime of manslaughter committed upon a sudden quarrel, I am compelled to dissent. To be guilty of manslaughter committed upon a sudden quarrel, the majority holds, the killer must commit the slaying with intent to kill.

I contend that Nebraska's manslaughter statute abrogates the common law and that the majority fails to give sufficient weight to pronouncements of this court, one of which declares that "[t]o come within the provisions of the manslaughter statute, the killing must not have been intentional or with a design to effect death." *State v. Worley*, 178 Neb. 232, 236, 132 N.W.2d 764, 767 (1965).

## COMMON LAW

Common law recognized two types of criminal homicide: murder and manslaughter. Murder was defined as " '[w]hen a person, of sound memory and discretion, unlawfully killeth any reasonable creature in being and under the king's peace, with malice aforethought, either express or implied.' " 2 W. Blackstone, Commentaries on the Laws of England § 229 at 2397 (W. Jones ed. 1916), citing 3 E. Coke, Institutes of the Laws of England ch. VII (1797). Manslaughter was divided into two branches, voluntary and involuntary.

Blackstone defined voluntary manslaughter as follows:

> *If upon a sudden quarrel two persons fight, and one of them kills the other, this is manslaughter* . . . and the law pays that regard to human frailty as not to put a hasty and deliberate act upon the same footing with regard to guilt. So, also, if a man be greatly provoked . . . and immediately kills the aggressor, though this is not excusable *se defendendo* (in self-defense), since there is no absolute necessity for doing it to preserve himself, yet

neither is it murder, *for there is no previous malice,* but it is manslaughter. But in this, and in every other case of homicide upon provocation, if there be a sufficient cooling time for passion to subside and reason to interpose, and the person so provoked afterwards kills the other, this is deliberate revenge and not heat of blood, and accordingly amounts to murder. . . . Manslaughter, therefore, on a sudden provocation differs from excusable homicide *se defendendo* (in self-defense) in this: that in one case there is an apparent necessity, for self-preservation, to kill the aggressor; in the other no necessity at all, being only a sudden act of revenge.

(Emphasis supplied.) 2 W. Blackstone, *supra,* § 225 at 2391-92.

Involuntary manslaughter "differs also from homicide excusable by misadventure in this: that misadventure always happens in consequence of a lawful act, but this species of manslaughter in consequence of an unlawful one." 2 W. Blackstone, *supra,* § 226 at 2392.

## NEBRASKA STATUTES

In 1866, in a session before statehood, the legislative assembly of the Territory of Nebraska adopted a criminal code including the following homicide definitions:

Murder is the unlawful killing of a human being, with malice aforethought, either express or implied. The unlawful killing may be perpetrated by poisoning, striking, starving, drowning, stabbing, shooting, or by any other of the various forms or means by which human nature may be overcome and death thereby occasioned.

Rev. Stat. § 18 (1866).

Manslaughter is the unlawful killing of a human being, without malice, express or implied, and without any deliberation whatever. It must be voluntary, upon a sudden heat of passion, caused by a provocation apparently sufficient to make the passion irresistible or involuntary, in the commission of an unlawful act, or a lawful act without due caution or circumspection.

Rev. Stat. § 21 (1866).

In cases of voluntary manslaughter, there must be a

serious and highly provoking injury inflicted upon the person killing, sufficient to excite an irresistible passion in a reasonable person, or an attempt by the person killed to commit a serious personal injury on the person killing.

Rev. Stat. § 22 (1866).

*The killing must be the result of that sudden, violent impulse of passion, supposed to be* **irresistible;** *for if there should appear to have been an interval between the assault or provocation given and the killing, sufficient for the voice of reason and humanity to be heard, the killing shall be attributed to deliberate revenge, and punished as a murder.*

(Emphasis supplied.) Rev. Stat. § 23 (1866). (It is noted that Nebraska does not recognize as a defense the concept of "irresistible impulse." *State v. Rincker*, 228 Neb. 522, 423 N.W.2d 434 (1988); *State v. Vosler*, 216 Neb. 461, 345 N.W.2d 806 (1984).)

Involuntary manslaughter shall consist in the killing of a human being without any intent so to do, in the commission of an unlawful act, or a lawful act, which probably might produce such a consequence, in an unlawful manner . . . .

Rev. Stat. § 24 (1866).

In 1873, the ninth session of the Legislature of the State of Nebraska adopted a new criminal code, patterned after Ohio's criminal code. See *Morgan v. State*, 51 Neb. 672, 71 N.W. 788 (1897). That code included the following homicide definitions:

If any person shall purposely, and of deliberate and premeditated malice, or in the perpetration, or attempt to perpetrate any rape, arson, robbery, or burglary, or by administering poison, or causing the same to be done, kill another; or, if any person, by wilful and corrupt perjury, or by subornation of the same, shall purposely procure the conviction and execution of any innocent person; every person so offending shall be deemed guilty of murder in the first degree, and, upon conviction thereof, shall suffer death.

Gen. Stat. § 3 (1873).

If any person shall purposely and maliciously, but

without deliberation and premeditation, kill another; every such person shall be deemed guilty of murder in the second degree; and on conviction thereof, shall be imprisoned in the penitentiary not less than ten years, or during life, in the discretion of the court.

Gen. Stat. § 4 (1873).

If any person shall unlawfully kill another *without malice*, either upon a sudden quarrel, or unintentionally, while the slayer is in the commission of some unlawful act, every such person shall be deemed guilty of manslaughter; and, upon conviction thereof, shall be imprisoned in the penitentiary, not more than ten years, nor less than one year.

(Emphasis supplied.) Gen. Stat. § 5 (1873).

The 1873 definitions have remained substantially unchanged. Current homicide definitions are found in Neb. Rev. Stat. §§ 28-303, 28-304, and 28-305 (Reissue 1985), and provide:

A person commits murder in the first degree if he kills another person (1) purposely and with deliberate and premeditated malice, or (2) in the perpetration of or attempt to perpetrate any sexual assault in the first degree, arson, robbery, kidnapping, hijacking of any public or private means of transportation, or burglary, or (3) by administering poison or causing the same to be done; or if by willful and corrupt perjury or subornation of the same he purposely procures the conviction and execution of any innocent person. The determination of whether murder in the first degree shall be punished as a Class I or Class IA felony shall be made pursuant to sections 29-2520 to 29-2524.

§ 28-303.

A person commits murder in the second degree if he causes the death of a person intentionally, but without premeditation.

§ 28-304(1).

A person commits manslaughter if he kills another *without malice*, either upon a sudden quarrel, or causes the death of another unintentionally while in the

commission of an unlawful act.
(Emphasis supplied.) § 28-305(1).

The most obvious differences between the 1866 homicide definitions and those adopted in 1873 are the inclusion of second degree murder and the deletion of the voluntary/involuntary manslaughter distinction. In fact, the words "voluntary" and "involuntary" no longer appear in the statute. Legislative history does not exist for this time period; however, it defies logic to assert that the changes made are unimportant.

## SECOND DEGREE MURDER AND MALICE

The majority opinion, quoting *State v. Hutter*, 145 Neb. 798, 18 N.W.2d 203 (1945), states:

> "The different degrees of homicide as defined by our statute are all carved out of murder and manslaughter as known to the common law. No new offense has been created, and no homicide which was not criminal at common law is made so by statute, but it is divided into degrees and the punishment graded to meet the circumstances of the particular case. The decisions of this court clearly hold to this view."

It is my position that common-law voluntary manslaughter was subsumed by the crime of second degree murder.

The majority states,

> "The *usual* type of *voluntary manslaughter* involves the intentional killing of another while under the influence of a reasonably-induced emotional disturbance (in earlier terminology, while in a 'heat of passion') causing a temporary loss of normal self-control. Except for this reasonable emotional condition, the intentional killing would be murder."

(Emphasis supplied.) (Quoting 2 W. LaFave & A. Scott, Substantive Criminal Law § 7.10(a) (1986).)

LaFave and Scott also point out:

> [V]oluntary manslaughter is *often* defined in the cases (and, sometimes, by statute) *as if* intent to kill were a required ingredient. *But, theoretically* at least, they might be of the intent-to-do-serious-bodily-injury, or of the

depraved-heart, types. Thus—to take the most common sort of voluntary manslaughter, a killing while in a reasonable "heat of passion"—*in most cases* the defendant *intentionally kills* the one who has aroused this passion in him. But if, in the throes of such a passion, he should intend instead to do his tormentor serious bodily injury short of death, or if he should, *without intending to kill him*, endanger his life by very reckless (depraved heart) conduct, the resulting death ought equally to be voluntary manslaughter rather than murder or no crime. The great majority of modern statutes, either by a reference to all cases which would otherwise be murder or by similar general language, take this broad view.

(Emphasis supplied.) *Id*. at 253. In my view, Nebraska case law and Nebraska's homicide statutes reflect that Nebraska has done away with the common-law distinctions of voluntary and involuntary manslaughter. Moreover, in Nebraska, a person is only exempt from criminal responsibility when he kills another while the killer is insane (Neb. Rev. Stat. § 29-2203 (Reissue 1985)) or is justified in killing under Neb. Rev. Stat. §§ 28-1406 to 28-1416 (Reissue 1985), Nebraska's justification of use of force act. The Legislature has not seen fit to exempt from criminal responsibility a person who kills another upon a sudden quarrel even though the killing was unintentional. The majority has by judicial fiat made such an exemption.

## NEBRASKA CASE LAW

The majority holds that Nebraska's manslaughter statute follows the common law in that it divides manslaughter into two types: voluntary and involuntary. Section 28-305(1) states: "A person commits manslaughter if he kills another *without malice*, either upon a sudden quarrel, or causes the death of another unintentionally while in the commission of an unlawful act." (Emphasis supplied.)

In support of its voluntary/involuntary conclusion, the majority relies upon *Boche v. State*, 84 Neb. 845, 122 N.W. 72 (1909), in which it was stated that the manslaughter statute did not change the common law. At that time, Nebraska's manslaughter statute was substantially similar to the one

quoted above: "If any person shall unlawfully kill another without malice, either upon a sudden quarrel, or unintentionally, while the slayer is in the commission of some unlawful act, every such person shall be deemed guilty of manslaughter . . . ." Comp. Stat. § 5 (1909).

*Boche* further held that when the homicide is upon a sudden quarrel, the killing must have been intentional, "but in sudden passion or heat of blood caused by a reasonable provocation . . . ." *Boche* at 854, 122 N.W. at 75. After citing this language, the majority states: "Consequently, we hold that, to sustain a conviction for voluntary manslaughter under § 28-305 (1), that is, a conviction for killing another, without malice, 'upon a sudden quarrel,' the State, by evidence beyond a reasonable doubt, must prove that the defendant *intended to kill*, and did kill, another." (Emphasis supplied.)

Prior to *Boche*, in *Bohanan v. The State*, 15 Neb. 209, 18 N.W. 129 (1883), although the case was decided upon other grounds, this court considered a refused jury instruction defining manslaughter as " 'the unlawful killing of another without malice, either express or implied, *which may be either involuntary, upon a sudden heat of passion*, or inadvertently, upon the commission of some unlawful act.' " (Emphasis supplied.) *Id.* at 215, 18 N.W. at 131.

The court affirmed the trial court's refusal to give this instruction, saying:

> As a general definition of manslaughter *under our statute this was correct.* But it was faulty in this, that the last clause had no application to the evidence. There was no pretense that the act was done "inadvertently upon the commission of some unlawful act." This instruction was, therefore, rightly refused.

(Emphasis supplied.) *Id.*

The *Bohanan* court also wrote, "A *malicious killing*, although done upon a sudden quarrel and in the heat of passion, is murder in the second degree at least." (Emphasis supplied.) *Id.* at 214, 18 N.W. at 131. In 1883, at least, this court recognized that Nebraska's homicide definitions changed the common law.

A decision of this court after *Boche, State v. Worley*, 178

Neb. 232, 132 N.W.2d 764 (1965), supports the rationale of *Bohanan*. In *Worley*, the court found that the facts of the case would support a conclusion that the killing occurred either upon a sudden quarrel or in the commission of an unlawful act. After making this finding, the court stated, "To come within the provisions of the manslaughter statute, *the killing must not have been intentional or with a design to effect death*." (Emphasis supplied.) *Id.* at 236, 132 N.W.2d at 767.

In *State v. Drew*, 216 Neb. 685, 344 N.W.2d 923 (1984), the defendant was charged with second degree murder. Drew was convicted of the lesser crime of manslaughter. The defendant claimed that she was acting in self-defense when the decedent was shot and died as a result of a bullet's striking the victim. The transcript reveals that the trial court, when it came to manslaughter, instructed the jury both upon the sudden quarrel and upon the unlawful act theories. No "intent" instruction was given in regard to manslaughter. Drew claimed the trial court erred in failing to instruct the jury that the burden was upon the State to prove beyond a reasonable doubt that the killing was not accidental. In upholding Drew's manslaughter conviction, this court declared:

> The threatening use of a firearm is an unlawful assault sufficient to convict one of manslaughter, when defined as causing the death of another unintentionally while in the commission of an unlawful act. . . . *Similarly, the accidental discharge of a gun, the use of which was not justified under the circumstances, is not a defense to manslaughter when the killing occurred upon a sudden quarrel.*

(Emphasis supplied.) *Id.* at 687-88, 344 N.W.2d at 925.

In *State v. Rincker,* 228 Neb. 522, 423 N.W.2d 434 (1988), this court affirmed the manslaughter conviction of the defendant. Rincker assigned as error the trial court's giving a manslaughter instruction, because he did not request such an instruction. We said: "The jury could well have concluded from the evidence that Rincker's wife was lying on the bed between the victim and Siegrist and that Rincker reacted to that scene *without any prior intention to kill the victim. That alone required the trial court to instruct the jury · concerning*

*manslaughter.*" (Emphasis supplied.) *Id.* at 534, 423 N.W.2d at 442.

In *Rincker*, this court also pointed out that "the fact remains that he [Rincker], albeit unintentionally, took a life," *id.* at 535, 423 N.W.2d at 442, and "[t]he manslaughter was an unintentional act; bringing the knife to the scene was an intentional act," *id.* at 535, 423 N.W.2d at 443. Nowhere does the opinion hold that it was illegal for Rincker to carry the knife to the scene.

These cases indicate that manslaughter in Nebraska does not require an intent to kill, whether the killing be upon a sudden quarrel or in the commission of an illegal act. I contend that *Boche*, sub silentio, has been overruled and that Nebraska no longer recognizes common-law voluntary and involuntary manslaughter or that intent to kill is an element of voluntary manslaughter.

The majority cites cases from California, Wyoming, New Mexico, and Idaho. Each out-of-state case is distinguishable in that the statutes considered *all specifically denote and define voluntary and involuntary manslaughter*. As shown above, the Nebraska statutes have not recognized these two types of manslaughter since 1873.

Even though the words "voluntary" and "involuntary" have not been a part of Nebraska's manslaughter statute since 1873, the majority insists upon reading them into our manslaughter statute.

Prior to adoption of the current criminal code in 1977, the second degree murder statute required that the killing be done "purposely and maliciously." Neb. Rev. Stat. § 28-402 (Reissue 1975). The new code defined second degree murder as a killing done "intentionally, but without premeditation." § 28-304. However, malice continues to be judicially required as an element of second degree murder. See *State v. Rowe*, 214 Neb. 685, 335 N.W.2d 309 (1983). This construction comports with legislative history which states that the new section is "comparable" to the former section. Summary of Contents L.B. 38, Judiciary Committee, 85th Leg., 1st Sess. 3 (1977).

It is my contention that "malice" is a judicially supplied essential element in second degree murder to distinguish second

degree murder from an intentional killing that is permitted by law under certain circumstances, i.e., a person's or law enforcement officer's killing someone where legally permissible under Nebraska's justification for use of force statutes, §§ 28-1406 to 28-1416.

This court's first attempt at defining malice after adoption of the 1873 criminal code appears to have been in *Milton v. The State*, 6 Neb. 136 (1877). That case held that malice is " '[t]he doing a wrongful act intentionally without just cause or excuse.' 2 Bouv. Law Dict., 91." 6 Neb. at 143.

This rule was expanded in *Carr v. State*, 23 Neb. 749, 756, 37 N.W. 630, 633 (1888), which defined malice as

a wicked and mischievous purpose which characterizes the perpetration of a wrongful or injurious act intentionally committed without lawful excuse. It is a mental condition on the part of the actor supposed to exist at the time of the commission of the offense, and is *imputed* to "doing of an unlawful act intentionally, without just cause or excuse."

The court in *Carr* cited *Milton*, but felt the rule was incomplete. *Carr* also cites the following definition:

"Malice, in the definition of murder, is imputed to an act done willfully, *malo animo*, an act wrong in itself, and injurious to another, and for which there is no apparent justification or excuse. . . . The natural or necessary conclusion and inference from such an act, willfully done without apparent excuse, are, that it was done *malo animo* in furtherance of the wrongful, injurious purpose, *previously*, though perhaps suddenly, formed, and is, therefore, 'a homicide with malice of forethought,' which is the true definition of murder."

*Carr* at 755-56, 37 N.W. at 633.

*Carr* was discussed in *Housh v. State*, 43 Neb. 163, 61 N.W. 571 (1895). This court stated that " ' "[m]alice," in its legal sense, denotes that condition of mind which is manifested by the intentionally doing of a wrongful act without just cause or excuse. It means any willful or corrupt intention of the mind.' " *Id*. at 167-68, 61 N.W. at 572. The court further stated that the above definition was substantially within the definition approved in *Carr*.

The definition of malice announced in *Housh* is nearly the same as the definition stated in *State v. Batiste*, 231 Neb. 481, 488, 437 N.W.2d 125, 130 (1989): " 'Malice,' in a legal sense,' denotes that condition of mind which is manifested by the intentional doing of a wrongful act without just cause or excuse." Obviously, the definition of malice has changed very little since 1877 and not at all since 1895.

The difference between second degree murder and manslaughter is significant. Second degree murder is committed when the killing is done intentionally without just cause or excuse, i.e., with malice; manslaughter is committed when the killing is without malice. Regardless of what the common-law definition may have been, malice, in Nebraska, is the intentional doing of an unlawful act without just cause or excuse. If a person is killed intentionally, whether done "upon a sudden quarrel" or not, the act is obviously done with malice, because killing another is an unlawful act unless the killing is exempt under §§ 28-1406 to 28-1416. It is logically impossible to distinguish between a killing done intentionally and one done with malice. A killing committed without malice is one committed unintentionally.

WHITE, J., joins in this dissent.

BOSLAUGH, J., dissenting.

I agree that the judgment in this case must be reversed, but it is my opinion that the cause should be remanded with directions to dismiss.

I agree with Judge Fahrnbruch that under the statutes of Nebraska the distinction between second degree murder and manslaughter upon a sudden quarrel is the presence or absence of an intention to kill.

Under our present statutes, murder is the unjustified intentional killing of another. Manslaughter is the unjustified killing of another *without malice*, upon a sudden quarrel or while in the commission of an unlawful act. Malice is the *intentional* doing of a wrongful act without just cause or excuse. Since manslaughter is a killing *without malice*, there can be no intention to kill in committing manslaughter.

In my opinion, there is not sufficient evidence to permit a

jury to find beyond a reasonable doubt that the defendant was guilty of manslaughter. As the majority opinion points out in great detail, the evidence as to how the victim was killed is equivocal.

In determining the sufficiency of circumstantial evidence to support a conviction, any fact or circumstance reasonably susceptible of two interpretations must be resolved most favorably to the accused. *State v. Earlywine*, 191 Neb. 533, 215 N.W.2d 895 (1974). Conjecture, speculation, or the choice of quantitative possibilities is not proof. *Mustion v. Ealy*, 201 Neb. 139, 266 N.W.2d 730 (1978). The State may not rely alone on inferences that would support a finding of guilt where several inferences are deducible from the facts proved, which inferences are opposed to each other but are equally consistent with the facts proved. *Anderson v. Farm Bureau Ins. Co.*, 219 Neb. 1, 360 N.W.2d 488 (1985).

It seems to me that the inference that the killing was accidental is at least as strong as the inference that it was a crime. Under those circumstances, a jury cannot be permitted to speculate as to how the victim came to her death.

WHITE and FAHRNBRUCH, JJ., join in this dissent.